**UNITED STATES of America**

v.

**Andrew L. STONE, Francis N. Rosenbaum, Evelyn R. Price, Robert B. Bregman, Chromcraft Corp., ALSCO, Inc.**

**Crim. No. 1233–68.**

United States District Court
District of Columbia.

Sept. 15, 1969.

76

John S. Martin, Jr., and Michael T. Epstein, Attorneys, Department of Justice, Washington, D. C., and Seymour Glanzer, Asst. U. S. Atty., Washington, D. C., for the United States.

Edward Bennett Williams, Vincent Fuller, and Robert Weinberg, Washington, D. C., for defendants Stone and Rosenbaum.

Norman London, St. Louis, Mo., of the Bar of the State of Missouri, admitted pro hac vice for defendant Price.

James C. Toomey, Washington, D. C., for defendant Bregman.

Chester M. Fulton, Washington, D. C., for defendants Chromcraft and ALSCO.

## MEMORANDUM

GASCH, District Judge.

■ The question before the Court is whether the Government must disclose records of intercepted telephone conversations in which one of the defendants in this case participated.[1] The exclusionary rule originating in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and applied to the states in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), excludes from a criminal trial any evidence seized from a defendant in violation of his Fourth Amendment rights. Fruits of such evidence may be excluded as well. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391–392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). "Because the Amendment now affords protection against the uninvited ear, oral statements, if illegally overheard, and their fruits are also subject to suppression. Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)."[2] The exclusionary rule applies as well to violations of Section 605 of the Communications Act of 1934,[3] which prohibits the interception and divulgence of telephone conversations without the authorization of the "sender."[4]

■ Hence whenever a defendant's conversations are illegally overheard, a suppression hearing must be held in order to determine whether the fruits of that illegal search contributed to the Government's case. Alderman v. United States, 394 U.S. 165, 180–185, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), further held that the Government must disclose its surveillance records, or logs, of intercepted conversations to defense counsel where the activities of its agents are illegal so that the defendant may adequately prepare for the suppression hearing.[5] Thus the issue here narrows to whether wiretapping activities of the Federal Bureau of Investigation were illegal in the first instance, that is, whether they invaded defendant's Fourth Amendment rights or violated Section 605 of the Communications Act.

The indictment charges Andrew Stone, Francis Rosenbaum, Evelyn Price, Robert Bregman and ALSCO, Inc., with conspiring to defraud the United States in the negotiation and administration of defense contracts under the general conspiracy statute, 62 Stat. 701, 18 U.S.C. § 371. From 1962 to 1967, defendant ALSCO, or its predecessor, Chromcraft Corporation, acted as the Government's principal supplier of rocket launchers for jet aircraft in Viet Nam. The Gov-

1. The motions of defendant to produce materials relating to electronic surveillance, and to suppress the fruits of illegal electronic surveillance, are two of several pretrial motions filed with the Court in this case. The Court has ruled on these other motions in a separate memorandum.

2. Alderman v. United States, 394 U.S. 165, 171, 89 S.Ct. 961, 965, 22 L.Ed. 2d 176 (1969).

3. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed.2d 314 (1937); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957); Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1967).

4. 48 Stat. 1103, 47 U.S.C. § 605 (1962).

5. See pp. 78–80, infra, for a discussion of this point.

ernment alleges that Chromcraft, by its Chief Executive Officer Andrew Stone, entered into fraudulent contracts with the Department of the Navy totaling some $47,000,000 and diverted over $4,000,000 into personally-held Swiss bank accounts. In addition to the conspiracy charge, the Grand Jury indicted defendants under numerous counts for submitting fraudulent cost and pricing forms to the Navy Department, submitting false "RB–1 Reports" to the Renegotiation Board,[6] and receiving some $73,000 in "kick-backs" from a subcontractor, Western Molded Fibre Products, Inc.[7]

In its pretrial Motion for Discovery and Inspection, defendants ask for "[a]ny electronic recordings of defendants' voices which were made as a result of investigations conducted by any agency of the Federal Government * * * during the course of any investigation resulting or contributing to the indictment in this case."[8] The Government responded: "[n]o defendant was ever the direct subject of unlawful electronic surveillance, and no evidence obtained by electronic surveillance was ever utilized in the investigation of this case." The Government admitted that between 1956 and 1961, agents overheard conversations participated in by defendant Rosenbaum "during the course of electronic surveillances utilized by the Federal Government to gather foreign intelligence information pertaining to national security." But it claimed that the overheard conversations were "in no way relevant to this case."[9]

This prompted motions by defendant Rosenbaum to produce and to suppress. In support of his motions, Rosenbaum attached an affidavit stating that he represented an official of the Government of the Dominican Republic from 1955 to 1958 and that since 1955 he has been an officer of and the legal counsel to a company partly owned by a former official of the Government of the Dominican Republic. He alleged that the company was "a principal subject of an investigation" by the FBI, and that between 1962 and 1964, FBI agents interviewed persons in his Washington law office in conjunction with the investigation. Rosenbaum, assuming the surveillances were illegal, moved for a hearing to ascertain the extent to which the Government's case had been tainted by the illegal evidence.

The Government responded with an affidavit signed by Attorney General John Mitchell, a memorandum in opposition to defendant's motion to produce, and two sealed envelopes. One (Exhibit A) is represented as containing typewritten logs of all overheard conversations participated in by Rosenbaum, and the other (Exhibit B) contains authorizations for the surveillances signed by the Attorney General in office at the time.

Attorney General Mitchell attested that on "various occasions" between 1956 and 1961, conversations involving Rosenbaum were overheard by Government agents who tapped telephone wires at three separate locations "solely for the purpose of gathering foreign intelligence information." He stated that it is apparent from the face of the sealed materials that Rosenbaum was not the "subject" of the surveillances and that the wiretaps "were being conducted to gather foreign intelligence information." Mr. Mitchell certified that it would "prejudice the national interest" to disclose publicly the "particular facts" concerning the surveillances and re-

---

6. A Federal agency charged with supervising Government contracts to eliminate waste and recover excess profits.

7. In the conspiracy count of the indictment, the Government alleges that the kickbacks totaled $663,481.05.

8. Defendant's Motion for Discovery and Inspection at 2.

9. The Government's Opposition to the Defendant's Comprehensive Motions for Discovery and Inspection at 4.

quested that the Court examine the logs *in camera*.[10]

In Alderman v. United States, *supra*, the Court rejected the Government's argument that the logs of illegal surveillances should undergo an initial screening by the trial judge *in camera* to determine whether they are "arguably relevant" before they are turned over to defense counsel. The Government contended that there are many instances where a person is "accidentally" overheard by a wiretap or eavesdrop conducted for a different purpose, that this is often obvious from the face of the surveillance records, and that since disclosure prejudices the national interest, it should not be required unless the logs appear to have something to do with the case. The Court rejected the argument, stating that full disclosure is necessary because only the defense attorney "acquainted with all the relevant circumstances" can winnow irrelevant material from "those items which might have made a substantial contribution to the case against a petitioner." 394 U.S. at 182, 89 S.Ct., at 971.

Turnover, however, is mandatory only where the surveillance is "illegal." In his concurring opinion in Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969), Justice Stewart, speaking of the constitutionality of surveillances, emphasized that the Court has not yet decided whether a surveillance conducted for the purpose of gathering foreign intelligence information violates the Fourth Amendment.[11] And, he added, *Alderman* nowhere specifies the procedure a trial judge is to follow in making the preliminary determination of constitutionality. The entire Court in Taglianetti v. United States, 394 U.S. 316, 317, 89 S.Ct. 1099, 1100, 22 L.Ed.2d 302 (1969), decided the

same day as *Giordano*, made the same point in broader language:

"Nothing in Alderman v. United States, Ivanov v. United States, or Butenko v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance."

The Court has examined the logs *in camera* to assist in its determination of the two principal questions of legality: (a) whether the Federal agents overheard the conversations by a means which violated defendant's Fourth Amendment protections, and (b) whether agents wiretapped in violation of Section 605 of the Communications Act of 1934.

I. Constitutionality of the Wiretaps under the Fourth Amendment.

The Government argues that the President, through the Attorney General, may constitutionally authorize Federal agents to overhear telephone conversations in order to gather foreign intelligence information in spite of the fact that the eavesdropping may infringe Fourth Amendment rights under present law. On the facts in this case, it is unnecessary to reach this question because the wiretaps before us do not violate defendant's Fourth Amendment rights under the constitutional doctrines in effect when the wiretaps occurred.

Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), concluded that the Fourth Amendment "protects people, not places." This holding extended Fourth Amendment protections against eavesdropping and wiretapping beyond the more limited view of the earlier cases which required "an actual intrusion into a constitution-

---

10. Affidavit of Attorney General John N. Mitchell dated May 7, 1969.

11. See also footnote 23 in the opinion of the Court in Katz v. United States, 389

U.S. 347, 358, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967), and the concluding paragraph in Justice White's concurrence, 389 U.S. at 363–364, 88 S.Ct. 507.

ally protected area." Silverman v. United States, 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). The Court in Desist v. United States, 394 U.S. 244, 246, 254, 89 S.Ct. 1048, 22 L.Ed.2d 248 (1969), held *Katz* was to be given "wholly prospective application" and would only govern the legality of wiretaps conducted after December 18, 1967. The wiretaps in the present case were conducted between 1956 and 1961. Hence, the doctrine of Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and *Silverman, supra*, applies, and it must appear that the instruments of the electronic surveillance invaded a "constitutionally protected area" [12] for defendant's Fourth Amendment rights to apply.

■ The Court is satisfied from its *in camera* examination of the logs of the conversations that no such invasion took place. Further, the Court declines to grant defendant's motion to conduct a hearing on this matter during which partial and protected [13] disclosure of the surveillance records and the authorizing memoranda might be made because the documents on their face reveal the facts necessary for this determination. See Taglianetti v. United States, *supra,* at 317, 89 S.Ct. 1099.

II. Legality of the Wiretaps under Section 605 of the Federal Communications Act of 1934.

The remaining question is whether the wiretapping activities conducted "solely for the purpose of gathering foreign intelligence information" [14] violated Section 605 of the Federal Communications Act.[15] That statute provides:

"[N]o person not being authorized by the sender shall intercept any communication and divulge * * * the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *."

When Justice Stewart stated in his concurring opinion in Giordano v. United States, *supra,* that the constitutionality of "foreign intelligence" surveillances was an open question, he made no reference to the legality of such taps under Section 605. However, since the consequences of illegality are the same as the consequences of a constitutional violation—disclosure in the face of substantial national security reasons for secrecy—the Court assumes that the Supreme Court, in spite of its holding in Nardone v. United States, 302 U.S. 379, 380, 58 S.Ct. 275, 82 L.Ed. 314 (1937), considers legality of foreign intelligence taps an open question under Section 605 as well.

In *Nardone,* the Court, in a sweeping decision, found that wiretap evidence acquired by Federal agents for use at a criminal trial was inadmissible. The Court there stated:

"Taken at face value the phrase 'no person' comprehends federal agents, and the ban on communication to 'any person' bars testimony to the

12. See also Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). In Lanza v. New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), the Court reviewed those areas deemed "constitutionally protected." They include a business office, a hotel room, an automobile, even an occupied taxicab, but not, as the Court held in *Lanza,* a jail cell.

13. Under Rule 16 of the Federal Rules of Criminal Procedure, the Court has wide latitude to issue protective orders accompanying the disclosure of documents. The Court could require that the documents be examined by defense counsel in chambers for a limited period of time and could impose heavy sanctions for the disclosure out of chambers of any confidential information. See *Alderman, supra,* 394 U.S. at 197, 89 S.Ct. 961, 22 L.Ed.2d 176 (concurring opinion of Harlan, J.). Defense counsel indicated he would not be satisfied with such limited disclosure. Transcript at 207–208 (June 16, 1969).

14. Affidavit of Attorney General Mitchell.

15. 48 Stat. 1103, 47 U.S.C. § 605 (1962).

content of an intercepted message. * * *

"The government contends that Congress did not intend to prohibit tapping wires to procure evidence. * * *

"We nevertheless face the fact that the plain words of section 605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that '*no person*' shall divulge or publish the message or its substance to '*any person*.' To recite the contents of the message in testimony before a court is to divulge the message. The conclusion that the act forbids such testimony seems to us unshaken by the government's arguments.

*    *    *    *    *    *

"It is urged that a construction be given the section which would exclude federal agents since it is improbable Congress intended to hamper and impede the activities of the government in the detection and punishment of crime. The answer is that the question is one of policy. Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty. The same considerations may well have moved the Congress to adopt section 605 as evoked the guaranty against practices and procedures violative of privacy, embodied in the Fourth and

Fifth Amendments of the Constitution." [16]

The Government argues that Section 605, in spite of *Nardone*, does not apply to wiretaps conducted for purposes of gathering foreign intelligence information for three principal reasons:

(a) Congress does not have the power to prohibit the President, "the nation's sole organ in the field of foreign affairs" as well as its Commander-in-Chief, from tapping telephones to "obtain information vital to the proper exercise of his power." [17]

(b) When Congress passed the 1934 Act, it did not intend to prohibit wiretapping authorized by the Attorney General to gather foreign intelligence information. At that time, no one was aware of the utility of wiretaps for intelligence gathering purposes and no one spoke to the problem. If Congress was concerned with wiretapping by Federal agents at all, it was concerned with the use of surveillances to procure information for criminal trials. [18]

(c) Presidents and Attorneys General since 1940 have consistently taken the position that nothing in Section 605 limits executive power to use wiretapping to gather foreign intelligence information essential to the national defense or for the conduct of international affairs. Since 1941, Attorneys General have advised Congress of their construction, [19] and Congress has taken no action indicating disagreement. [20]

■ This Court finds that telephonic surveillances conducted solely for pur-

16. Nardone v. United States, 302 U.S. 379, 381–383, 58 S.Ct. 275, 82 L.Ed. 314 (1937) (footnotes omitted). In the second *Nardone* case, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Court stated that it intended the exclusionary rule of the original *Nardone* case to prohibit the Government from making any use whatsoever of information gathered by illegal means:

" 'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.' See Gouled v. United States, 255 U.S. 298, 307, 41 S.Ct. 261, 65 L.Ed. 647." 308 U.S. at 340–341, 60 S.Ct., at 267.

17. Government's opposition at 13–14.

18. *Id.*, at 15–16.

19. *Id.*, at 11–12.

20. *Id.*, at 16.

poses of gathering foreign intelligence information, without the consent of either party to a conversation, are not proscribed by Section 605. There ·is no indication in the legislative history of the Act that Congress intended to prohibit wiretaps authorized by the Attorney General for these purposes. Nardone v. United States, *supra*, reflects a similar unawareness of the problem and its accompanying considerations of the need to gather intelligence information and the need to keep those· activities secret. It is apparent that the *Nardone* Court, in preferring to allow "some offenders" to go "unwhipped of justice" rather than to permit the government to "resort to methods * * * destructive of personal liberty," [21] was not speaking to the considerations involved in the very different question of permitting the accumulation of foreign intelligence information by telephonic wiretap.

Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957), and Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968), progeny of *Nardone*, are equally unrelated to the kind of wiretaps in question. The Court's concern in these cases is with the use of information gathered by federal agents or state police for use against persons accused in domestic criminal proceedings. The same is true of United States v. Coplon, 185 F.2d 629 (2d Cir. 1950).

Since Section 605 does not apply, it follows that the exclusionary rule of *Nardone* and Benanti v. United States,

355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957), formulated to "compel respect for the federal law," [22] is equally inapplicable.[23]

■ From its *in camera* examination of the logs, the Court is satisfied that the Government is speaking in good faith when it represents that the exclusive purpose of these wiretaps was to gather foreign intelligence information. In addition, the Court finds from this examination that the surveillances were accompanied by the proper authorization of the Attorney General. And finally, as an incidental matter, the Court was singularly impressed with the absence of any rational connection between the logs and the allegations of this case.

The Court's holding regarding Section 605 is limited to wiretaps conducted solely for the purpose of gathering foreign intelligence information. Wiretaps conducted entirely or in part for other purposes raise different issues. But where the Government is in fact collecting information solely in the area of foreign intelligence, and where the wiretaps are properly authorized by the President through the Attorney General for this purpose, this Court is of the opinion that telephonic surveillances are not violative of Section 605 or "inconsistent with ethical standards and destructive of personal liberty" [24] as were the surveillances condemned in *Nardone, Benanti,* and *Lee,* which were conducted to collect information for use at criminal trial.

Order accordingly.

21. 302 U.S. at 383, 58 S.Ct., at 277.

22. Lee v. Florida, 392 U.S. 378, 387, 88 S.Ct. 2096, 2101, 20 L.Ed.2d 1166 (1967).

23. Under the framework of *Alderman, supra,* exclusion is not necessary because "a finding by the District Court that the surveillance was lawful would make disclosure and further proceedings unnecessary." Giordano v. United States, 394 U.S. 310, 313, 89 S.Ct. 1164, 22 L.Ed. 2d 297 (1969).

24. Nardone v. United States, 302 U.S. at 383, 58 S.Ct., at 277.