Keith FORSYTH

v.

Richard G. KLEINDIENST, individually and as Attorney General of the United States, L. Patrick Gray, 3rd, individually and as Acting Director, Federal Bureau of Investigation, John N. Mitchell, individually and as former Attorney General of the United States, John Doe and Richard Roe, Albert Cooper and David Porter.

Appeal of John N. MITCHELL, Albert Cooper, and David Porter.

Keith FORSYTH, Plaintiff-Respondent,

Hon. Raymond J. Broderick, United States District Judge, Nominal Respondent,

v.

Richard G. KLEINDIENST, et al., Defendants,

John N. Mitchell, Defendant-Petitioner.

Nos. 83–1812, 83–3150.

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1983.

Decided March 8, 1984.

Rehearing Denied April 3, 1984.

See also, 3d Cir., 700 F.2d 104.

Peter F. Vaira, Jr., U.S. Atty., Newark, N.J., J. Paul McGrath, Asst. Atty. Gen., John J. Farley, III, Barbara L. Herwig, Gordon W. Daiger, Larry L. Gregg (argued), Civil Division, Dept. of Justice, Washington, D.C., for appellant-petitioner.

David Rudovsky (argued), Kairys, Rudovsky & Maguigan, Philadelphia, Pa., for appellee-respondent.

Before WEIS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This case involves former Attorney General John N. Mitchell's second interlocutory appeal from a denial of both absolute and qualified immunity for his authorization of unconstitutional FBI electronic surveillances of Keith Forsyth's telephone conversations with William Davidon. *Forsyth v. Kleindienst,* 599 F.2d 1203 (3d Cir.1979)

("*Forsyth I*"), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), *reh. denied* 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1025 (1981). We remanded the first interlocutory appeal directing the district court to decide a narrow factual question in the context of the absolute immunity test we enunciated in *Forsyth I*. However, we declined to consider the qualified immunity defense in *Forsyth I* because it was a non-appealable interlocutory order. On remand, the district court denied defendant Mitchell both absolute and qualified immunity.

Mitchell's appeal does not assert that the district court, 599 F.2d 1203, erred in the factual finding on remand or erred in its application of the *Forsyth I* test to that factual finding. Instead, he argues that two recent Supreme Court decisions, *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) ("*Nixon*") and *Harlow & Butterfield v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("*Harlow*"), which were decided after *Forsyth I*, but before the district court's disposition of this case on remand, control this case and mandate the application of a test different from that enunciated in *Forsyth I*. Moreover, Mitchell argues that *Harlow* allows us to consider anew whether the interlocutory order denying qualified immunity may be appealed. Finally, Mitchell seeks a Writ of Mandamus on the issue of qualified immunity.

We hold that *Forsyth I*, as the law of the case, continues to control our disposition of this case. In our view, *Nixon* and *Harlow* simply do not demand an approach or result different from that directed by us in *Forsyth I* and followed by the district court on remand. Accordingly, we affirm the district court's denial of absolute immunity and dismiss, as non-appealable, Mitchell's interlocutory appeal of the district court's denial of qualified immunity. Finally, we

deny petitioner Mitchell's request for a Writ of Mandamus.

### I.

Keith Forsyth ("Plaintiff/Appellee") initiated this action in September, 1972 claiming that former Attorney General John N. Mitchell ("Defendant/Appellant")[1] violated his rights under the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 and the First, Fourth, Sixth and Ninth Amendments to the Constitution. The alleged violation stemmed from Mitchell's authorization of a warrantless electronic surveillance in which Forsyth's telephone conversations with William Davidon, a professor at Haverford College and allegedly a member of an organization under investigation, were overheard. Following discovery, the district court denied cross-motions for summary judgment. *Forsyth v. Kleindienst*, 447 F.Supp. 192 (E.D.Pa. 1978). The court also rejected Mitchell's claims of absolute immunity and qualified immunity. *Id.* at 198–99, 201.

Mitchell filed a motion for reconsideration and, alternatively, sought certification of the district court's opinion for interlocutory appeal under 28 U.S.C. § 1292(b); he was unsuccessful in both attempts. A notice of appeal was subsequently filed whereupon plaintiff moved to dismiss the appeal because it was interlocutory. This court held that "the denial of defendants' motions for summary judgment on the issue of absolute immunity is appealable under the *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) collateral order doctrine," but dismissed the defendant's interlocutory appeal from the denial of qualified immunity. *Forsyth I*, 599 F.2d at 1208 (citation added).

On the merits of the appeal in *Forsyth I*, this court rejected Mitchell's argument that

---

**1.** Former Attorney General Richard G. Kleindienst and former Acting Director of the Federal Bureau of Investigation ("FBI"), L. Patrick Gray, 3rd, were also named originally as defendants. Plaintiff subsequently admitted that the complaints against them should be dis-

missed, and the appropriate court order was later entered. Two FBI employees, E. David Porter and Albert Cooper, also had been named defendants in an amendment to Forsyth's original complaint, but they too were dismissed.

"[a]s the head of an executive agency, the Department of Justice, ... he should not be held liable for what he characterizes as an error in judgment." *Id.* at 1209, 1209–10. We analyzed his absolute immunity claims primarily in the context of *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (*"Butz"*) and *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (*"Imbler"*). We interpreted *Butz* and *Imbler* as providing the shield of absolute immunity only in situations where an official charged with a constitutional violation is engaged in adjudicative or prosecutive functions. Thus, in *Forsyth I*, we held as follows:

> Our reading of *Butz* and *Imbler* leads us to the conclusion that the Attorney General's decision to authorize the warrantless electronic surveillances is protected by the shield of absolute immunity when it is made in the context of a quasi-judicial function; however, when the decision arises in the context of a purely investigative or administrative function, the decision will not be protected by absolute immunity.

*Forsyth I*, 599 F.2d at 1215.

Accordingly, the case was remanded to the district court to decide the narrow question of whether Mitchell's authorization of the wiretap was closely connected with the judicial process and whether the wiretap was necessary to initiate a criminal prosecution.

On that issue, a hearing was held, but Mitchell failed to present any evidence which would support a quasi-judicial purpose for the surveillance. Indeed, the district court stressed that

> [p]rior to the hearing of January 8, 1982, the government filed a memorandum of law, an affidavit, and several accompanying exhibits. At no time, however, did the government present any evidence, documentary, testimonial, or otherwise, suggesting that defendant Mitchell meant anything other than what was said in his deposition.

*Forsyth v. Kleindienst*, 551 F.Supp. 1247, 1252 (1982).

During his deposition testimony Mitchell revealed the following uncontested facts:

> [T]he Davidon wiretap had an *investigatory* purpose, i.e., to obtain more details about the suspected plot to destroy utility tunnels in Washington, D.C. and to kidnap National Security Council Chairman Henry Kissinger so that the Justice Department, acting through the FBI, might thwart these schemes.

*Id.* (emphasis added). Moreover, Mitchell admitted that he did not know whether a criminal proceeding had been initiated or whether a criminal investigation was pending regarding Davidon or the other alleged utility tunnel and Kissinger plot members at the time he authorized the wiretaps. The crucial testimony on this issue is quoted below:

> Q. When you received this request [from FBI Director J. Edgar Hoover for authorization for the Davidon wiretap], did it occur to you that the information that could be obtained or would be obtained as a result of this tap could be used in a criminal prosecution?
>
> A. It was not the point of my focus in authorizing the electronic surveillance.
>
> Q. What was the point of your focus?
>
> A. *The gathering of information necessary to protect the national security and to get information on foreign intelligence.*

Volume II Appendix ("II. App.") at 106 (emphasis added); *see also* II. App. at 92–96, 104–06; 123–26; 154–55. Because Mitchell testified, without repudiation, that the wiretap was authorized for national security purposes, not for any prosecutorial quasi-judicial function, the district court took him at his word.

It concluded that "[t]he purpose of the wiretap was prevention—not prosecution," *Forsyth v. Kleindienst*, 551 F.Supp. at 1252, and that "Attorney General Mitchell was not in any way weighing factors in order to determine whether and whom to prosecute." *Id.* Thus, applying the *Forsyth I* test, which combined the "special function" tests of *Butz* and *Imbler*, the district court held that absolute immunity

does not shield Mitchell from liability in the present action. *Id.* at 1253.

The district court also ruled against Mitchell on the issue of qualified immunity. Relying on *Harlow,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), the district court granted summary judgment to the plaintiff because it believed that defendant Mitchell did not meet the test enunciated in *Harlow.* The district court reasoned that because Mitchell failed to establish an objective basis for believing his action to be lawful at the time he authorized the wiretaps in question, the clearly established law made his warrantless wiretapping an unconstitutional violation of plaintiff's rights. *Forsyth v. Kleindienst,* 551 F.Supp. at 1261.

Applying the *Forsyth I* test and the "special function" approach of *Butz* and *Imbler,* the district court denied defendant Mitchell's claim for absolute immunity. It also denied him qualified immunity and granted plaintiff summary judgment on the issue of liability.

Although the case was set for trial on the issues of damages, the district court declined to certify its decision for interlocutory appeal and denied defendants' Motion for a Stay of Trial pending appeal. *Id.* at 1263–66; Vol. I Appendix ("I. App.") at 37–45. This court granted a stay, allowed the appeal on the absolute immunity issue, and referred the appealability of the qualified immunity issue to the merits panel. *Forsyth v. Kleindienst,* 700 F.2d 104–10 (1983). Mitchell also filed a Petition for Mandamus on the issue of qualified immunity. That petition, No. 83–3150, has been consolidated and referred to this panel for resolution.

## II. Absolute Immunity

■ We will consider first whether the former Attorney General John N. Mitchell should be absolutely immune from civil liability for permitting the domestic electronic surveillance of Keith Forsyth's telephone conversations with William Davidon without prior judicial authorization. The denial of a claim of absolute immunity is an interlocutory order appealable under the collat-

eral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); however, this is the second time that defendant Mitchell presents this issue to us on interlocutory appeal. The last time, in *Forsyth I,* we enunciated a test and directed the district court to apply that test in deciding whether Mitchell was performing a quasijudicial function in authorizing the wiretap and therefore entitled to absolute immunity.

Following our directive, the district court correctly applied the test enunciated in *Forsyth I* in denying Mitchell absolute immunity. Mitchell argues now that two recent intervening decisions of the Supreme Court control and make the *Forsyth I* test inappropriate. Mitchell concludes that under *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 341 (1982) and *Harlow & Butterfield v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) we must find him absolutely immune from civil liability. Mitchell concedes, however, that but for his interpretation in *Nixon* and *Harlow,* the district court's decision—not having been based on a clearly erroneous finding of fact or misapplication of our directive in *Forsyth I*—would have to be affirmed. Thus, we must decide whether the Supreme Court's recent decisions of *Nixon* and *Harlow* require us to modify our *Forsyth I* test and the result in this case.

■ *Nixon* expressly concerned the scope of the former President Richard Nixon's immunity. The finding of absolute immunity for Nixon turned on his former office as President. The Supreme Court held that the former President of the United States is protected by the doctrine of absolute immunity from damages arising from his official acts because of his unique and singular position in our constitutional system. *Nixon,* 102 S.Ct. at 2701. The pertinent language of its holding in *Nixon* is as follows:

> We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional

tradition of the separation of powers, and supported by our history.

. . . . .

The President occupies a unique position in the constitutional scheme. Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States ..." This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity.

. . . . .

In arguing that the President is entitled only to qualified immunity, the respondent relies on cases in which we have recognized immunity of this scope for governors and cabinet officers. E.g., *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895; *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90. We find these cases to be inapposite. *The President's unique status under the Constitution distinguishes him from other executive officials.*

*Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government.*

*Nixon,* 102 S.Ct. at 2701–03 (emphasis added; footnotes omitted). *See also Harlow,* 102 S.Ct. at 2735.

■ In carving out a shield of absolute immunity for the former President, the Court continued to apply the standards enunciated in *Butz,* 438 U.S. at 478, 98 S.Ct. at 2896 and *Imbler,* 424 U.S. at 409, 96 S.Ct. at 985. In *Nixon* the Court devoted several pages of analysis to demonstrating how its holding there was in fact consistent with *Butz* and *Imbler.* The Court distinguished between the President and cabinet officers such as the Attorney General, declaring that the President's "unique status under the Constitution distinguishes him from other executive officials." *Nixon,* 102 S.Ct. at 2702. Consequently, we reject defendant Mitchell's assertion that *Nixon* controls this case and mandates a result different from that reached by the district court.

Having decided that *Nixon* fails to provide Mitchell with an escape from the law of the case and binding effect of *Forsyth I,* we turn to his reliance on *Harlow* for his claim of absolute immunity. Defendant Mitchell uses *Harlow* for support of a "special functions" analysis. In *Harlow,* the Court reiterated its prior recognition "that the judicial, prosecutorial, and legislative functions require absolute immunity." *Harlow,* 102 S.Ct. at 2735. Therefore, the Court declined to grant the undifferentiated extension of absolute immunity to a President's aides. Defendant concedes however in his Motion to Stay Trial pending appeal that a "special functions" argument already has been considered and *"sub silentio* rejected" by this court in *Forsyth I.* Defendant's Motion to Stay Trial at 9.

In *Forsyth I* we considered and interpreted the *Butz* "special functions" approach to provide absolute immunity to an Attorney General engaged in a quasi-judicial function. That approach was reaffirmed by the Supreme Court in *Nixon* and recognized with approval in *Harlow. See Harlow,* 102 S.Ct. 2733; *Nixon,* 102 S.Ct. 2700. As Judge Sloviter observed, "[t]he references in *Harlow* to the absolute immunity which might be accorded on the basis of 'special functions' make it clear that the Court did not announce any new law but merely reiterated what it had previously said in *Butz v. Economou." Forsyth v. Kleindienst,* 700 F.2d at 104, 109 (Opinion Sur Grant of Stay) (Sloviter, J., dissenting). Thus, we reject Appellant's argument that *Harlow* requires a result different from that reached by the district court in its application of our *Forsyth I* test.

For these reasons we believe that the district court did not err in denying Mitchell's absolute immunity claim for the unwarranted electronic surveillance of Forsyth's telephone conversation with William Davidon.

III. Appealability of Summary Denial of Qualified Immunity

 Defendant Mitchell appeals also the district court's summary denial of his qualified immunity claim. This interlocutory appeal was previously before us in *Forsyth I* and we found it non-appealable.[2] The Supreme Court denied certiorari, *Forsyth v. Kleindienst*, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), and denied rehearing, 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1025 (1981) on *Forsyth I*. As stated earlier, *Forsyth I*, as the law of this court, binds us unless the Supreme Court has mandated otherwise.

Mitchell argues that, at the time of our *Forsyth I* opinion, the doctrine of qualified immunity did not protect a defendant from the burdens of trial, but only from liability. *Forsyth I*, 599 F.2d at 1209. Moreover, Mitchell asserts that *Harlow* has reformulated the qualified immunity doctrine mandating its appealability as a final order within 28 U.S.C. § 1291. Additionally, he relies on *McSurely v. McClellan*, 697 F.2d 309, 315–16 (D.C.Cir.1982) (per curiam) as persuasive support for his argument.

 While sharing the concern for protecting government officials from insubstantial claims, we adopt the view of Judge Sloviter "that concern over subjecting government officials to unwarranted claims is best handled through adjustment of the substantive rules of law, as the Supreme Court has recently done, and not by changing the established practice of limiting appellate review of interlocutory decisions." *Forsyth v. Kleindienst*, 700 F.2d at 110 (1983) (Opinion Sur Grant of Stay) (Sloviter, J., dissenting).

 Qualified or "good faith" immunity is an affirmative defense which the particular official who seeks to rely on it must plead. The pre-*Harlow* qualified or "good faith" immunity contained both subjective and objective elements. "The objective element involves a presumptive knowledge of

and respect for 'basic, unquestioned constitutional rights.'" *Harlow*, 102 S.Ct. at 2737, quoting *Wood v. Strickland*, 420 U.S. 308, 320, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). The Court in *Harlow* indicated that the subjective element referred to "permissive intentions" and it reasoned that "[t]he subjective element of the good faith defense frequently has proved incompatible with the [Supreme Court's] admonition in *Butz* [*v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895] that insubstantial claims should not proceed to trial." *Harlow*, 102 S.Ct. at 2737. Therefore, in *Harlow*, the Supreme Court dropped the subjective fact-oriented element of qualified immunity and reformulated the doctrine in terms of objective good faith.

 Because of *Harlow* a summary judgment motion initiated by a defendant government official can now be granted despite a plaintiff's claim that the government official lacked subjective good faith in his challenged actions. Thus, a government official may avoid insubstantial claims that are based on claims alleging the absence of subjective good faith. We interpret *Harlow* as encouraging the summary disposition of insubstantial claims brought against government officials, not as relaxing the rule limiting interlocutory appeals.

Moreover, we do not find Mitchell's reliance on *McSurely v. McClellan*, 697 F.2d 309 (D.C.Cir.1982) (per curiam) persuasive support for allowing an interlocutory appeal of a denial of qualified immunity. *McSurely* holds that "appellate review of a denial of a motion for summary disposition must be available to ensure that government officials are fully protected against unnecessary trials under qualified immunity on the same basis as for absolute immunity." *Id.* at 316. It emphasized that under *Harlow* "part of the purpose of immunity, whether absolute or qualified, is to shield government officials from 'the risks of trial—distraction of officials from their governmental duties, inhibition of discre-

---

2. The dissent stresses the fact that this is an old case and that the facts are not disputed; and therefore, we ought put this case to rest now.

However, we cannot base the appealability of cases based on the length of time that the parties have been involved in litigation.

tionary action, and deterrence of able people from public service.'" *Id., quoting Harlow v. Fitzgerald,* 102 S.Ct. at 2738. Thus, the *McSurely* court concluded that, under *Harlow,* the Supreme Court "consciously sought to facilitate summary disposition of insubstantial claims against government officials." *Id.*

■ In the case before us, however, we are without the insubstantial claims which concerned the *Harlow* and *McSurely* courts. The district court here did not defeat a defendant's motion for summary judgment simply because a plaintiff alleged a subjective lack of good faith on the part of a defendant. Instead, the district court relied on the new objective standard enunciated in *Harlow* and found defendant Mitchell liable on summary judgment. Therefore, *Harlow* and *McSurely* are distinguishable from this case.

At this juncture it is again appropriate to quote from Judge Sloviter's dissenting opinion from the majority's decision to deny the motion to dismiss the appeal of this issue and instead refer consideration of it to the merits panel:

> The pages of current legal publications are replete with justified concern about the crushing burden under which the courts of appeals are operating. [We] fear that the decision of the panel today to allow this appeal under the mantle of the *Cohen* collateral doctrine order and to deny the motion to dismiss [would] open the sluices to a flood of interlocutory appeals crushing us even further under a weight of our own making.

*Forsyth v. Kleindienst,* 700 F.2d at 110. (Opinion Sur Grant of Stay) (Sloviter, J., dissenting).

We decline to subject our colleagues to unnecessary additional burdens by opening the sluice gates; thus, mindful of our binding precedent in *Forsyth I* and the large number of state, local, and federal officials that often rely on claims of immunity, we will dismiss defendant's challenge to the district court's denial of his claim to qualified immunity. We will also deny, for the

same reasons, defendant's Petition for Writ of Mandamus.

IV.

Accordingly, we will affirm the district court's denial of absolute immunity, dismiss the appeal of the denial of qualified immunity, and deny the Petition for Writ of Mandamus.

WEIS, Circuit Judge, dissenting.

I am persuaded that in addition to absolute immunity, the issue of qualified immunity is properly before this court. Determining that the "clearly established" test has not been met, I would find that defendant meets the requirements for qualified immunity and is entitled to judgment. Accordingly, I dissent.

I

In *Forsyth v. Kleindienst,* 599 F.2d 1203, 1208 (3d Cir.1979) (*Forsyth I*), we concluded that denial of summary judgment based on the lack of absolute immunity was appealable under the collateral order doctrine, *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). In the absolute immunity context, as happens when dismissal on double jeopardy grounds is denied, *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the right not to be subjected to trial is irretrievably lost if appellate review must await final adjudication on the merits. The order of the district court here, denying absolute immunity and directing that the matter proceed to trial, is final on that issue and is ripe for appellate review. I agree with the majority's ruling on this jurisdictional question because it is consistent with the Supreme Court's treatment of the appeals in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), and *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The present appeal raises the defendant's contention that the district court erred in denying not only absolute, but qualified immunity as well. In the earlier

appeal, we concluded that the refusal of qualified immunity could not be reviewed on a theory of "tag along" or "pendent" appellate jurisdiction. In *Cohen*-type appeals only claims that fall within the collateral order exception will be entertained. *Abney*, 431 U.S. at 663, 97 S.Ct. at 2042. Therefore, an order denying qualified immunity must itself meet the jurisdictional requirements of 28 U.S.C. § 1291 (1976).

At the time *Forsyth I* was before us, the qualified immunity defense rested on factors not amenable to pre-trial resolution. *See Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). We concluded therefore that the denial of summary judgment on that defense was not immediately appealable.

Three years after we decided *Forsyth I*, the Supreme Court reappraised and substantially revised the test for qualified immunity in *Harlow*. 457 U.S. at 815–20, 102 S.Ct. at 2737–2740. Recognizing that its previous formulation often did not permit pre-trial termination of insubstantial law suits, the Court acknowledged that "an adjustment of the 'good faith' standard" was essential, *id.* at 815, 102 S.Ct. at 2737, and announced a new test. Under it "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2739.

This objective standard now permits summary judgment for the official if the law was not "clearly established" at the time the challenged action occurred. But even if the right's existence had been settled, courts should grant qualified immunity if the defendant "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." *Id.* at 819, 102 S.Ct. at 2739.

In urging that insubstantial claims be determined before trial and even before discovery, the Court itemized costs borne not only by the defendant officials, but by society as well. "[T]he expenses of litigation, the diversion of official energy from pressing public issues, ... the deterrence of able citizens from acceptance of public office," and the inhibition from "unflinching discharge" of duty were cited as consequences to be avoided. *Id.* at 814, 816–17, 102 S.Ct. at 2738–39. The Court also recognized the risks imposed on public officials who must defend their actions before a jury, emphasizing that "in times of political passions, dishonest or vindictive motives are readily attributed ... and [are] readily believed." *Id.* at 814 n. 23, 102 S.Ct. at 2737 n. 23, *quoting Tenney v. Brandhove*, 341 U.S. 367, 378, 71 S.Ct. 783, 789, 95 L.Ed. 1019 (1951).

In short, avoiding trial through prompt disposition of insubstantial claims by summary judgment is as compelling an objective in cases properly invoking qualified immunity as in those where absolute immunity is available. The *Harlow* Court strongly urged early resolution of non-meritorious law suits that "undermine the effectiveness of government." 457 U.S. at 800–01 n. 35, 102 S.Ct. at 2730–2731 n. 35.

It follows inexorably that withholding appellate correction of erroneous pre-trial denials of qualified immunity frustrates Harlow's purpose in revising the test. If timely appellate review is not available to redress incorrect preliminary rulings, the right to be relieved of the burdens of trial will, just as in *Abney*, be irretrievably lost. *See also Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979). In summarizing *Cohen*'s rationale, Abney explained that "by permitting immediate appeal under those circumstances, this Court made sure that the benefits of the statute were not 'cancelled out.'" 431 U.S. at 662 n. 7, 97 S.Ct. at 2041 n. 7. The common thread running through *Abney, Helstoski*, and *Harlow* is the necessity for early appellate review to prevent subjecting defendants to unnecessary trials.

The Courts of Appeals for the Eighth Circuit and the District of Columbia have

similarly concluded that preserving that exemption requires immediate appeal from denial of summary judgment based on qualified immunity. *Evans v. Dillahunty*, 711 F.2d 828 (8th Cir.1983); *McSurely v. McClellan*, 697 F.2d 309 (D.C.Cir.1982). The *Dillahunty* court, however, properly cautioned that an order withholding qualified immunity is appealable only when the essential facts are not in dispute and the question is a matter of law.

In an unpublished opinion, the Court of Appeals for the Fourth Circuit in *Benford v. American Broadcasting Co.*, 707 F.2d 504 (4th Cir.1983), *cert. denied, Holton v. Benford*, — U.S. —, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983), refused to entertain an appeal from a denial of summary judgment. In that case, the district court had concluded that the plaintiff's asserted rights had been clearly established at the time of the challenged conduct. I do not find the *Benford* opinion persuasive because in remitting the defendant to trial the court said that "there is no right irretrievably lost to them by this decision." That statement does not adequately heed *Harlow*, or credit its common denominator with *Abney* and *Helstoski*—the right to be free from unnecessary trial.

The Fourth Circuit's later decision in *Bever v. Gilbertson*, 724 F.2d 1083 (4th Cir.1984), is readily distinguishable. There, the court declined to take jurisdiction of a qualified immunity appeal because, in addition to damages, the plaintiffs had requested injunctive relief and trial was necessary on that claim whatever the resolution of the immunity question. Without commenting on the merits of that conclusion, I need only note that the Court of Appeals observed that the case was different from one, as here, where the effect of the immunity claim would terminate the litigation. I am persuaded that we focused on the proper standard in *Britton v. Howard Savings Bank*, 727 F.2d 315 (3d Cir.1984), where we said that "the most significant issue with respect to appealability of collateral orders is their effect on parties *pendente lite*,

rather than the relationship of issues already decided to the ultimate merits."

I conclude that when no essential facts are in dispute and the question is one of law, the *Abney-Cohen* line of cases establishes jurisdiction for appeals from denials of qualified immunity. *Harlow*'s objectives require no less. Unlike the majority I find that the denial of qualified immunity in this case presents us with an appealable order.

II

Having determined that this court has jurisdiction for both the qualified and absolute immunity phases, I turn to the merits. Although the majority finds that our earlier decision on absolute immunity is dispositive, I must confess some doubt on that score.

*Harlow*'s discussion of the "special functions" test, as it might apply to the Attorney General in cases implicating national security, lends a force to the defendant's argument here that was lacking in *Forsyth I*. "For aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest." *Harlow v. Fitzgerald*, 457 U.S. at 812, 102 S.Ct. at 2735. This "special functions" notion is different from the prosecutorial role we reviewed in *Forsyth I*. Arguably, it is much more likely that the Attorney General is eligible for special functions consideration than is the Secretary of Agriculture. *Cf. Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). However, because I believe that qualified immunity is applicable here as a matter of law, I do not dwell on the absolute immunity issue.

The qualified immunity question is sharply drawn: was the requirement that the Attorney General of the United States secure judicial authorization for wiretaps undertaken for national security purposes "clearly established" before January 6, 1971.

The various sources to be surveyed in determining the state of the law at the pertinent time have not yet been identified but case law is an obvious beginning point. *See Procunier v. Naverette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Reese v. Nelson,* 598 F.2d 822 (3d Cir.1979); *Princeton Community Phone Book, Inc. v. Bate,* 582 F.2d 706 (3d Cir.1978).

A

The wiretap in the case at bar was removed on January 6, 1971. Not until 1972, one year and five months later, was the right to be free from warrantless governmental surveillance in domestic security cases recognized by the Supreme Court. The resolution of the problem was a sensitive issue requiring careful constitutional analysis and balancing. *See United States v. United States District Court,* 407 U.S. 297, 299, 92 S.Ct. 2125, 2128, 32 L.Ed.2d 752 (1972) (*Keith* ).

*Keith* observed that electronic surveillance in national security cases had been sanctioned since 1946. *Id.* at 310, & n. 10, 92 S.Ct. at 2133, & n. 10. "Successive Presidents for more than one-quarter of a century have authorized such surveillance in varying degrees, without guidance from the Congress or a definitive decision of this Court. This case brings the issue here for the first time." *Id.* at 299, 92 S.Ct. at 2128.

The inquiry, as the Supreme Court posed it, was "the delicate question of the President's power, acting through the Attorney General, to authorize electronic surveillance in internal security matters without prior judicial approval.... Its resolution is a matter of national concern...." *Id.* The Court's opinion could not more clearly define the matter before it for decision.

Plaintiff argues, nevertheless, that the earlier case of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), "clearly established" his right to be free of searches conducted without prior judicial approval. In *Katz,* the defendant was charged with a gambling offense. His conversation in a telephone booth was intercepted by police officers who had attached a listening and recording device to the outside of the booth. The Court held that the police activity constituted a search requiring prior judicial approval.

It is significant that *Katz* was not a national security case, and the Court did not purport to decide the warrant issue in that context. Indeed, a footnote to the majority opinion disclaimed any such intention. "Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case." 389 U.S. at 358 n. 23, 88 S.Ct. at 515. In a concurring opinion, Justice White, referring to that disavowal, wrote, "in footnote 23 the Court points out that today's decision does not reach national security cases. Wiretapping to protect the security of the Nation has been authorized by successive Presidents. The present Administration would apparently save national security cases from restrictions against wiretapping." *Id.* at 363, 88 S.Ct. at 517. Only Justices Douglas and Brennan took exception to Justice White's statements. *See id.* at 359–60, 88 S.Ct. at 515–516. The Court, referring to the question before it in *Keith,* said: "It addresses a question left open by *Katz.*" 407 U.S. at 309, 92 S.Ct. at 2132. *See also Giordano v. United States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). I am convinced that before 1972 the law was not "clearly established" by the Supreme Court.

B

In reviewing other federal court decisions it is interesting that before 1971 the cases had not separated the national security justification for warrantless surveillance into the categories of "domestic" and "foreign" intelligence. As *Keith* observed, both situations were sometimes referred to as "national security" threats. 407 U.S. at 309, n. 8, 92 S.Ct. at 2133, n. 8. Not until January 8, 1971—after the wiretaps in this case had been terminated—did a district court suggest that different tests might apply in each situation. *United States v.*

*Smith,* 321 F.Supp. 424 (C.D.Cal.1971). In all the reported decisions antedating the surveillance here—*United States v. Clay,* 430 F.2d 165 (5th Cir.1970); *United States v. Butenko,* 318 F.Supp. 66 (D.N.J.1970); *United States v. Brown,* 317 F.Supp. 531 (E.D.La.1970); *United States v. Stone,* 305 F.Supp. 75 (D.D.C.1969); *United States v. O'Baugh,* 304 F.Supp. 767 (D.D.C.1969)— the government advanced foreign intelligence grounds for warrantless electronic surveillance. In each instance, the court found no violation of the Constitution or the Communications Act of 1934, 48 Stat. 1103 (current version at 47 U.S.C. § 605 (1982)).

In two unreported decisions, *United States v. O'Neal,* No. KC–CR–1204 (D.Kan. September 1, 1970), and *United States v. Dellinger,* No. 69 CR 180 (N.D.Ill. February 20, 1970), warrantless wiretaps were undertaken by the government on the basis of threats to domestic security. The surveillance was found to be proper in both of those cases. Although these unreported cases do not have the same effect as published opinions, they are relevant.

Thus the Attorney General's decision to authorize the wiretap here was made in an era when the sparse lower federal court case law unanimously supported the theory that no warrant was required in national security cases. These cases provide no support for the plaintiff's theory that the law was "clearly established." If anything, they suggest the opposite—that settled law held no warrant was required.

Only after the taps here were terminated did a district court hold that electronic surveillance in domestic security cases required judicial authorization. *United States v. Smith,* 321 F.Supp. 424 (C.D.Cal. 1971). Two weeks later the rationale of *Smith* was accepted and followed in *United States v. Sinclair,* 321 F.Supp. 1074 (E.D.Mich.1971), the case ultimately affirmed by the Supreme Court in *Keith.*

The first occasion for appellate review of whether the law in this field was "clearly established" arose when some individuals overheard in the *Keith* surveillance sought damages from the Attorney General and others as a result of the taps which the Supreme Court had found to be illegal. In reviewing the grant of summary judgment in favor of the former Attorney General, the Court of Appeals for the District of Columbia concluded that the defendant had not violated "clearly established, authoritatively declared law." *Sinclair v. Kleindienst,* 645 F.2d 1080, 1084 (D.C.Cir.1981). En route to reaching that result, the Court discussed cases I cited earlier.

Post-*Harlow,* that Court of Appeals again reviewed an Attorney General's entitlement to qualified immunity. *Zweibon v. Mitchell,* 720 F.2d 162 (D.C.Cir.1983) (*Zweibon IV*). At issue were wiretaps authorized in the period from September 1970 through June 1971. After an exhaustive review of the case law, the court found that the illegality of the defendant's "conduct was not 'clearly established' by any reasonable definition of the phrase." *Id.* at 169. The court dismissed arguments that the *Smith* and *Sinclair* cases, decided by district courts in January 1971, established the state of the law. *Id.* at 171. Also rejected was plaintiff's suggestion that the validity of his position was established by memoranda prepared by the Attorney General's subordinates in 1969 professing some doubt on the constitutionality of national security wiretaps. These memos were characterized as mere predictions of future action by the Supreme Court and discussions of strategic considerations for potential litigation. *Id.* at 170–71.

The same Court of Appeals performed a similar review to determine the state of the law in 1977 with respect to foreign intelligence electronic surveillance. *Chagnon v. Bell,* 642 F.2d 1248 (D.C.Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). Observing that *Keith* had not resolved the issue, the court held that liability could not be imposed on the Attorney General "for failure to anticipate legislative reform." *Id.* at 1263. In the circumstances of the times, "the Attorney General was entitled to consider a broad range of options in exercising the wide

scope of discretion that his post entails; he was also obligated to act swiftly and firmly at the risk that action deferred [would] be futile or constitute virtual abdication of office." *Id. quoting Scheuer v. Rhodes*, 416 U.S. at 246, 94 S.Ct. at 1691.

It is also significant that the Court of Appeals for the Ninth Circuit has concluded that the law was not even "clearly foreshadowed" when the Attorney General authorized wiretaps in 1969 and as late as 1972. *Weinberg v. Mitchell*, 588 F.2d 275 (9th Cir.1978). *Cf. Zweibon v. Mitchell*, 606 F.2d 1172 (D.C.Cir.1979). As I have observed in the past, the "clearly established" standard requires more definitive explication and certainty than the "foreshadowing" test used in connection with the retroactivity doctrine.[1] *Marino v. Bowers*, 657 F.2d 1363, 1376 n. 5 (3d Cir. 1981) (Weis, J., dissenting); *accord Zweibon v. Mitchell*, 720 F.2d 162 (D.C.Cir.1983) (*Zweibon IV*). Since "clearly foreshadowed" is a lesser test, *Weinberg* is additional support for the proposition that the law was not "clearly established."

### C

Contemporaneous statutes do not alter the conclusion that the law was not "clearly established." Court decisions of the period did not suggest that the Attorney General's procedure conflicted with extant statutory law.

*Keith* found that Title III of the Omnibus Crime Control & Safe Streets Act, 18 U.S.C. §§ 2510–2520, authorizing wiretaps under certain conditions, did not resolve the issue in that case. The Court characterized the statute as an "expression of Congressional neutrality" and "not the measure of the executive authority asserted," 407 U.S. at 308, 92 S.Ct. at 2132. However, the proviso for presidential power, 18 U.S.C. § 2511(3),[2] had led several courts to conclude that wiretaps authorized by the Attorney General for national security purposes did not violate the statute. *See United States v. Clay*, 430 F.2d at 171–72; *United States v. Butenko*, 318 F.Supp. at 73; *United States v. Brown*, 317 F.Supp. at 536–37; *United States v. Dellinger*, No. 69 CR 180, Transcript at 20–21. *See also United States v. Stone*, 305 F.Supp. at 81–82; *United States v. O'Baugh*, 304 F.Supp. at 768 (Attorney General's procedure did not violate § 605 of Communications Act of 1934).[3]

Since all of these courts also upheld the constitutionality of the warrantless surveillance, it is reasonable to conclude that Title III was at best neutral, if not in fact Congressional recognition of the President's power to continue to authorize surveillance.

The other statute pertaining to wiretaps, section 605 of the Federal Communications Act of 1934, 48 Stat. 1103, has no relevance here because its scope was limited to prohibiting the use of wiretapped conversations as evidence in court proceedings, a point not presented in the case at hand. *Cf., Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); *United States v. Coplon*, 185 F.2d 629 (2d Cir.1950).

---

**1.** The retroactivity of *Keith* is not before us at this time. I therefore have assumed retroactivity *arguendo*.

**2.** The proviso reads in part:
"Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government."

**3.** Legal commentators appear to have been uncertain about the import of the proviso. *Compare Schwartz*, "The Legitimation of Electronic Eavesdropping: The Politics of 'Law and Order,'" 67 MICH.L.REV. 455, 490–94 (1969) (section legitimates president's power); *with* Note, "Eavesdropping at the Government's Discretion—First Amendment Implications of the National Security Eavesdropping Power," 56 CORNELL L.REV. 161, 162–63 (1970) (does not regulate president's power); *and* Note, "Wiretapping and Electronic Surveillance—Title III of the Crime Control Act of 1968," 23 RUTGERS L.REV. 319, 334–36 (1969) (Congressional attempt to fill vacuum left by Court in *Katz*; section frees eavesdropping by authority of the President from requirements elsewhere in statute).

### D

A survey of law review writings on the subject in 1968–70 is interesting. Although most of the commentators advocated the view that was later adopted in *Keith*, their urging of that approach is in itself a testimonial to the fact that their position was not yet the law.[4]

Thus a review of Supreme Court and other federal court decisions, the statutory provisions, and scholarly commentary all demonstrate that the law of warrantless electronic surveillance in national security cases was only beginning to develop in 1970–71. Unquestionably, a prohibition against warrantless searches in these circumstances was not "clearly established."

### III

The majority declines to consider the merits of the qualified immunity defense fearing that allowing a *Abney-Cohen* appeal will open the gates to a flood of interlocutory appeals. As one of those affected by the heavy case load in this court, I am not completely unsympathetic to that approach. However, I am not persuaded that it is the proper one because we must take a broader view of the federal judicial system. Sound judicial administration argues against declining a meritorious appeal when the result is to require a district court to hold a useless trial. We cannot ignore the fact that docket pressures exist in the trial as well as in the appellate courts.

The majority position is particularly regrettable in a case such as this where the question at issue is purely one of law and no discretionary element is present. The state of law in 1971 is a matter of history. The opinions are printed in bound volumes and will not change. The text of the statutes as they existed at that time cannot be varied either now or after trial. All of the material needed to decide the issue is before us and will be no different years from now.

But primarily, we should grant complete review to the legal question here because otherwise we fail to meet the obligation imposed upon us by *Harlow*. The Supreme Court candidly acknowledged that its previous decisions on qualified immunity were incompatible with speedy and inexpensive disposition of non-meritorious cases. To correct that shortcoming, the Court did not hesitate to revise the applicable test. However, that acknowledgment of deficiency and the effort to put it aright will be all for naught if the courts of appeals fail to exercise jurisdiction in appropriate cases.

This court should not relegate to a later date the inevitable correction of an erroneous district court appraisal of past law. This litigation has lasted far too long. It should be terminated now.

Thirteen years ago plaintiff was overheard three times when he spoke with Davidon on the telephone. Plaintiff concedes that he suffered no pecuniary loss and his freedom of expression was not chilled. The district court has awarded one dollar as nominal damages, and the only claim remaining is for punitive damages. Remand for resolution of this issue will require a possibly lengthy trial, *see Forsyth v. Kleindienst*, 700 F.2d 104, 105–06 (3d Cir.1983), and cause the precise harm *Harlow* seeks to avoid.

I dissent.

**4.** Representative of the many articles written are: Spritzer, "Electronic Surveillance by Leave of the Magistrate: The Case in Opposition," 118 U.PA.L.REV. 169 (1969); Theoharis & Meyer, "The 'National Security' Justification for Electronic Eavesdropping: An Elusive Exception," 14 WAYNE L.REV. 749 (1968); Note, "Wiretapping and Electronic Surveillance—Title III of the Crime Control Act of 1968," 23 RUTGERS L.REV. 319 (1969); Comment, "Privacy and Political Freedom: Application of the Fourth Amendment to 'National Security' Investigations," 17 U.C.L.A.L.REV. 1205 (1970).