Patrick E. Higginbotham, Circuit Judge, filed specially concurring opinion.

**James ELLIOTT and Joseph Defley, Plaintiffs-Appellants,**

v.

**Leander H. PEREZ, Jr., etc., Defendant,**

**Eugene E. Leon, Jr., etc., and Frank Klein, Defendants-Appellees.**

**No. 83–3243.**

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1985.

---

Camille F. Gravel, Jr., Anna E. Dow, Baton Rouge, La., for James Elliott.

Michael S. Fawer, New Orleans, La., for Joseph Defley.

Peter J. Butler, New Orleans, La., for Eugene Leon.

Gerald J. Gallinghouse, Margaret Anne Bretz, New Orleans, La., for Frank Klein.

Before CLARK, Chief Judge, and BROWN and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case concerns the doctrines of judicial and prosecutorial immunity. The District Court, 561 F.Supp. 1325 (E.D.La.1983), dismissed the plaintiffs' claims against a state judge and an assistant district attorney for damages resulting from their acts. We find that the absolute constitutional tort immunity accorded to some government officials requires the trial judge to demand heightened standards of pleading by plaintiffs in cases in which that doctrine is going to come into play. In cases against governmental officials involving the likely defense of immunity we require of trial judges that they demand that the plaintiff's complaint state with factual detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity. We therefore vacate the judgment (as to Klein and Judge Leon) and remand to the district court.

*Shenanigans in Plaquemines*

This appeal results from a series of events over several days in early 1981 centering on the activities of a special grand jury sitting in Plaquemines Parish, Louisiana.[1] The grand jury had been impaneled in August 1979 to investigate assertedly illegal dealings of certain public officials in the Parish. Five individuals, who are the

1. We recite the facts as alleged in the plaintiffs' complaints and appellate brief.

parties to this suit, were closely connected to the grand jury: defendant Leander H. Perez, Jr., was the Plaquemines Parish district attorney who originally convened the grand jury; defendant Frank Klein was first assistant district attorney to Perez; defendant Eugene E. Leon, Jr., was then the judge of the 25th Judicial District Court in which the grand jury was impaneled; plaintiff James Elliott was the foreman of the grand jury; and plaintiff Joseph E. Defley, Jr., was a witness before the grand jury on two occasions. For eighteen months, the grand jury performed its investigation into public corruption.

On the evening of February 15, 1981—four days before the term of the grand jury was to expire—Elliott, the grand jury foreman, received an envelope at his home containing a letter and several copies from Defley, the witness. In the letter Defley expressed the view that district attorney Perez' deceased father had illegally "bilked" the Parish out of a substantial number of valuable mineral leases beginning in the 1930s by diverting them to his company, Delta Development Company, Inc. He suggested that Perez and his brother and sisters, who were then the major shareholders of Delta Development, were as culpable as their deceased father, and that the grand jury should indict them for various crimes. Perez, the letter stated, might also be indicted for refusing to investigate and prosecute the theft of public funds. Defley urged Elliott to share the "ideas" in the letter with the other members of the grand jury and, in closing, asked that the letter be kept out of "general circulation." [2]

Elliott distributed copies of the letter to the members of the grand jury the next morning. Perez, assistant district attorney Klein, and then district judge Leon apparently did not know about the letter at this point. On February 17, two days before its term was to lapse, the grand jury indicted Perez for the theft of $43 million in Parish funds and his company, Delta Development, for the theft of $72 million in Parish funds.

Elliott sought out a member of the district attorney's office to sign the indictment, as he and the other members of the grand jury thought that some sort of official authorization was necessary to validate the instrument. The *ad hoc* district attorney [3] refused to sign because Judge Leon had told him his authority extended only to matters concerning Perez' brother Chalin, and Perez was the legal advisor to the grand jury for other matters. Klein similarly refused to sign the indictment. He said that as a member of Perez' staff he could not participate in the indictment of the district attorney, nor of the corporation of which Perez was a major owner.

Elliott then contacted Judge Leon for his advice. He asked Judge Leon, the judicial officer responsible for the special grand jury, to direct an officer of the court to sign the indictment. Judge Leon assured Elliott that he would arrange a conference with the State Attorney General on the matter the next day. He told Elliott that the grand jury should adjourn for the day.

Still on February 17, Klein informed Perez of the pending indictments against him and Delta Development. At noon that day,

2. In addition, attached to the letter was a resolution which Defley stated he had previously proposed to the Parish's Commission Council. The resolution required a strict accounting and disgorgement from Delta Development and various members of the Perez family of all funds received in connection with leases on public lands in the Parish. It also required certain oil companies in the Parish to turn over to the Commission Council all funds that those companies would otherwise pay to Delta Development or its shareholders as profits from mineral leases on public lands. Lastly, the resolution requested that the U.S. Attorney for the Eastern District

of Louisiana and the U.S. Justice Department take whatever criminal or civil action necessary to secure return of all public lands and moneys unlawfully diverted to Delta Development and its shareholders.

3. Perez had recused himself from any grand jury proceedings relating to Chalin O. Perez, his brother. Chalin was president of the Commission Council and was an object of the investigation. Judge Leon had appointed Giles J. Duplechin to act in Perez' stead as district attorney *ad hoc* for those matters.

Perez, Klein, and Judge Leon met at a restaurant outside the Parish to discuss the situation. Perez asked Klein to prepare a motion for the district attorney to recuse himself from involvement with the indictments. Klein telephoned Elliott from the restaurant, and told him of Perez' decision to recuse himself and his staff from the matter.[4]

Perez and Klein met again later that day. Perez at some point learned of Defley's letter and that it had been distributed to the grand jury members. He sought the advice of the Jefferson Parish district attorney and of a private lawyer. Both told him to move to discharge the grand jury since it had been tainted by outside influence.[5]

On the morning of February 18, one day before the official end of the term of the special grand jury, Perez presented to Judge Leon a motion to discharge the grand jury, along with Defley's letter. The motion stated that the grand jury had "completed the function for which it was impaneled and had completed its report on all offenses presented to it by the District Attorney." Judge Leon by formal decree ordered that the grand jury be discharged as of that morning. He then telephoned Elliott and told him and the other grand jury members to report to his courtroom. When they arrived, Judge Leon advised them that the grand jury had been discharged. He did not inquire of them whether they had any further matters on which to report. Judge Leon also told Elliott that Perez had filed bills of information charging Elliott and Defley with conspiring to extort Perez, as evidenced by Defley's letter to Elliott.

Later that day, Perez filed the bills. Defley and Elliott were charged, arrested, confined, and forced to post bond for their release.[6]

At Judge Leon's urging Klein filed another bill of information against Defley one week later (February 25), charging him with jury tampering, again relating to his February 15 letter to Elliott.[7]

On February 27, the State Attorney General moved to supersede Perez' office in any criminal matters arising out of the activities of the special grand jury. The motion was granted almost a year later on February 24, 1982, pursuant to a writ issued by the Louisiana Supreme Court on May 18, 1981. All charges against Elliott and Defley were thereafter dropped.

### A Quick Abort in Federal Court

Elliott and Defley brought separate suits seeking compensatory and punitive damages stemming from the asserted deprivation of their civil rights by the defendants.[8] Their complaints were substantially identical and were ultimately consolidated.

The most critical thing—which put the trial judge in the middle of a constitutional guessing game—was the loose charge that Perez, Klein, and Judge Leon *conspired* through the criminal prosecution and discharge of the grand jury to injure the plaintiff because the grand jury had indicted Perez.

This claim—on which every serious constitutional question turns—was pleaded in the following blunderbuss fashion in each of the complaints:

> Complainant further shows that the actions of defendants LEANDER H. PEREZ, JR., FRANK KLEIN and EUGENE

---

**4.** Although the recusal motion was apparently prepared, it was never presented to the court.

**5.** However, both lawyers may not have known about the pending indictments against Perez and Delta Development.

**6.** Over a month later Perez eventually recused himself from prosecution of the extortion charges.

**7.** Perez did not recuse himself from prosecution of the jury tampering charge until May 18, 1981, almost three months later.

**8.** The plaintiffs expressly sued under 42 U.S.C. §§ 1983, 1985, & 1986. They also sued the 25th Judicial District Court, the State Attorney General, and the State itself for injunctive relief from the extortion and jury tampering charges, which at that point had not yet been dropped.

E. LEON, JR., the defendants PEREZ, KLEIN and LEON *conspired* to deter by force, intimidation or threat *through the criminal prosecution of complainant and improper discharge of the special grand jury* to influence the verdict, presentment and indictment of the special grand jury and specifically [plaintiff Elliott] as foreman of the special grand jury and *to injure complainant* in his person and property on account of the action taken by the special grand jury in voting the indictment of defendant LEANDER H. PEREZ, JR., and Delta Development Company, Inc., which indictments had been lawfully assented to and which indictments ought to have been signed by a person in authority and returned prior to the official discharge date of the special grand jury.

(Emphasis added).

Prior to any discovery or responsive pleadings, Perez and Klein moved to dismiss the claims against them based on their absolute immunity as prosecutors to suits for money damages. Judge Leon filed a similar motion based on his absolute immunity as a judge. The District Court denied Perez' motion but granted Klein's motion, treating both as motions for summary judgment. The Court also granted Judge Leon's motion to dismiss. It entered final judgments as to Klein and Judge Leon under F.R.Civ.P. 54(b), to which the plaintiffs timely noticed their appeal.[9]

### An Absolute Need for Trial Courts to Demand Clear Pleading

The blunderbuss phrasing of the arguable claims in the plaintiffs' complaints, (just quoted) presents this Court initially with an issue which goes to the heart of the "immunity" from damage suits long accorded certain government officials. In view of the purposes of the immunity defense, as declared by the Supreme Court and this Court, we conclude that allowing broadly-worded complaints, such as those of the plaintiffs here, which leaves to traditional pretrial depositions, interrogatories, and requests for admission the development of the real facts underlying the claim, effectively eviscerates important functions and protections of official immunity.

### The Immunity Doctrine

Modern immunity doctrine is the product of explicit judicial balancing of the usually adverse interests which are implicated in suits brought by private persons injured by the acts of public officials.

> On one side are the private desire to obtain redress for governmentally imposed injuries and the public interest in both punishment and deterrence [of official wrongdoing].... Foremost among [the countervailing] interests is the public aim of shielding officials from liability so that they do not become overly cautious in the performance of their duties.[10]

This balance was thoughtfully articulated in an oft-quoted passage from *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case

---

**9.** Perez did not appeal the Trial Court's order as to him. *Cf. Williams v. Collins,* 728 F.2d 721, 724–27 (5th Cir.1984) (district court order denying claim of absolute immunity, even though before final judgment, is per se appealable *Cohen* order if "sufficiently free of fact questions as to present a question of law"); *Metlin v. Palastra,* 729 F.2d 353, 355 (5th Cir.1984) (order denying claim of qualified immunity may be reviewed on appeal in the interest of judicial economy).

**10.** *The Supreme Court, 1981 Term,* 96 Harv.L. Rev. 4, 229 (1982); *see also* Schuck, *Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages,* 1980 Sup.Ct. Rev. 281, 281–85.

has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

*Id.* at 581.[11]

■ As courts have weighed the conflicting values inherent to the immunity concept, they have acknowledged that the scales do not always tip evenly. For those officials whose especially sensitive governmental functions or constitutional status require complete protection from suit, the Supreme Court has recognized the defense of "absolute" immunity.[12] Likewise, those officials whose functions do not require complete insulation from liability have traditionally been accorded a qualified, or "good faith" immunity.[13]

While immunity theory has traditionally focused on freedom from liability for damages, the Supreme Court has also emphasized the substantial costs which result from merely subjecting public officials to

the *defense* of damage claims. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court discussed the problems which had arisen in the application of the former two-prong, subjective/objective test for qualified immunity first enunciated by it in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).[14] The *Harlow* court pointed out that under the experience of *Wood* many courts had considered an official's subjective good faith to be a question of fact, requiring extensive factual inquiry and resolution by a jury and the prospect of adverse determination. 457 U.S. 800, at 816, 102 S.Ct. at 2737–38, 73 L.Ed.2d at 409. The Court then addressed the weakness of this approach:

> [i]t now is clear that substantial costs attend the litigation of the subjective good faith of government officials. [There are] the general costs of subjecting officials to the risk of trial—distraction of officials from their governmental duties, inhibition of discretionary action,

---

**11.** This balancing act has been a recurrent theme in discussions of the immunity doctrine. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396, 407–08 (1982) (citing quoted passage); *Butz v. Economou,* 438 U.S. 478, 505–06, 98 S.Ct. 2894, 2909–11, 57 L.Ed.2d 895, 915–17 (1978) (weighing interests in providing "redress to the injured citizen" and "deter[ring] federal officials from committing constitutional wrongs" against the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority").

**12.** Officials enjoying absolute immunity to suits for money damages include legislators, for acts in their legislative capacity, *see, e.g., Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), judges, for their judicial acts, *see, e.g., Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), prosecutors, for acts in initiating and pursuing a prosecution, *see, e.g., Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), other executive officers performing prosecutorial or adjudicative functions, *see Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and the President of the United States, *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982).

**13.** Under the qualified immunity standard, government officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. Qualified immunity has been recognized for certain Executive Branch officials, *see Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), governors and their aids, *see Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and police officers, *see Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

**14.** The *Wood* court divided the qualified immunity defense into objective and subjective elements. The objective element involves an official's knowledge of and respect for basic constitutional rights. The subjective component refers to "permissible intentions." *Wood,* 420 U.S., at 322, 95 S.Ct. at 1000–01. Under this test, the defense of qualified immunity was defeated if an official "knew or reasonably should have known that the action he took within the sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury...." *Id.* at 322, 95 S.Ct. at 1001.

and deterrence of able people from public service.... Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.

*Id.* at 816–17, 102 S.Ct. at 2738, 73 L.Ed.2d at 409–10 (footnotes omitted).

In order to free public officials from the burden of proving their good faith in taking official actions, the Court eliminated the subjective element of the qualified immunity test. The *Harlow* court expressed its belief that the new *Harlow* qualified immunity standard would permit "the resolution of many insubstantial claims on summary judgment." *Id.*, 457 U.S., at 818, 102 S.Ct. at 2739. Consonant with its desire to shield public officials from the diversion of their energies through the forced defense of challenges to actions taken in their governmental capacities, the Court held that until resolution of the threshold question of the application of an immunity defense, "discovery should not be allowed." *Id.*[15] *Harlow* therefore was born out of the experience-based recognition that until the time the trial court can determine whether there is a substantial basis for the claim of immunity, those entitled to official immunity should be free not only from ultimate liability, but also from trial, and the ofttime overwhelming preliminaries of modern litigation.

This Circuit has likewise accepted the premise that the protected official should be sheltered from trial and pretrial preparation as well as liability. *Williams v. Collins*, 728 F.2d 721, 726 (5th Cir.1984).[16] *Harlow* and *Williams* together can be read as stating a basic precept of immunity doctrine—that subjecting officials to trial, traditional discovery, or both concerning acts for which they are likely immune undercuts the protection from governmental disruption which official immunity is purposed to afford. Whether the official's immunity is absolute or qualified, allowing any but perhaps the most preliminary proceedings on the immunity-barred claim runs squarely counter to the doctrine's basic protective purpose: that officials be free to exercise their duties and functions without fear of having their attentions distracted by the subsequent claims of unhappy or unsuccessful litigants.

As this court through the words of Judge Rubin recently explained in a case involving judicial immunity:

Judges may, and on occasion do, depart from their judicial roles and inflict grievous hurt on others. Often the allegations of misconduct by judges are hyperbolic and either untrue or unprovable; but sometimes ... a person who is a judge intentionally commits a mischievous act. Nevertheless, while courts are not blind to the human vices that may lurk behind the robe, they have struck society's balance in favor of judicial immunity. A wrong committed by a judge

---

**15.** We recognize that this aspect of *Harlow* dealt immediately with the extent of the "qualified" or "good faith" immunity defense. However, its rationale for eliminating the subjective intent inquiry for good faith immunity—to eliminate the frustrating interferences with continued official duties arising from the very nature of the litigation process—applies with even greater force where the official's special functions or constitutional status accords an absolute immunity to damage suits. Moreover, as Judge Higginbotham has emphasized for us "[the] distinction between absolute and qualified immunity may well not survive *Harlow*'s language on the function of qualified immunity." *Williams v. Collins*, 728 F.2d 721, 726 n. 6 (5th Cir.1984). *But see, Kenyatta v. Moore*, 744 F.2d 1179 at 1183–1185 (5th Cir.1984) ] (orders denying qual-

ified immunity not ordinarily appealable). The Supreme Court will apparently examine this distinction, as it has granted certiorari to determine the appealability of orders denying qualified immunity, *see Forsyth v. Kleindienst*, 729 F.2d 267 (3d Cir.1984), *cert. granted sub nom., Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 322, 83 L.Ed.2d 259 (1984).

**16.** We held in *Williams* that orders denying claims of *absolute* immunity before trial or final disposition are immediately appealable, 728 F.2d at 726, for otherwise "the right at stake [to be free from the burdens of litigation] would [be] irretrievably lost by the continuation of trial court proceedings. *Id.* at 725. *But see* note 15 *supra.*

might on occasion be remedied by holding the judge a tortfeasor. Much graver harm would be done to the justice system and consequently to the social fabric, however, by requiring judges to account for the reasons why they took judicial action, and to absolve themselves from charges of improper motive or other impropriety. Absolute judicial immunity is an essential shield in a justice system that depends on its judges to "exercise their functions with independence and without fear of consequences," not apologia for the errant behavior of judges who act injudiciously or malovently.

*Thomas v. Sams*, 734 F.2d 185, 189 (5th Cir.1984) (footnotes omitted).

Where, as here, plaintiffs' complaint alleges in broad, indefinite and conclusory terms that two government officials, each having the status entitling each to claim immunity has, in his official capacity, violated plaintiffs' rights, the groundwork is laid for disruption of the official's duties, and frustration of the protections and policies underlying the immunity doctrine.

What is a federal trial judge to do? One thing he may not do: face it as just another lawsuit in which the notice pleading's liberal policy of F.R.Civ.P. 8 [17] counts on pretrial discovery to ascertain the factual basis for the claim, and as here, a defense. Allowing pretrial depositions, especially those taken adversely of the governmental official to ferret all of his actions and the reasons therefor, either for the purpose of being able to plead more specifically, or for use in the prospective trial would defeat and frustrate the function and purpose of the absolute and qualified immunity ostensibly conferred on the official.

▮ The public goals sought by official immunity are not procedural. Indeed, they go to very fundamental substantive objectives. To the extent that F.R.Civ.P. 8 and the practices under it present any conflict, the trial court must find a way to adapt its procedures to assure full effectuation of this substantive right, since the Enabling Act [18] provides that the rules shall not abridge, enlarge or modify any substantive right.

In addition, use of liberal discovery to establish the basis of a claim is directly at odds with the Court's direction in *Harlow* that government officials entitled to immunity be freed from the burdens, the stress, the anxieties and the diversions of pretrial preparations.

Actually, we, and other courts,[19] have tightened the application of Rule 8 where the very nature of the litigation compels it. In the now familiar cases invoking 42 U.S.C. § 1983 we consistently require the claimant to state specific facts, not merely conclusory allegations.[20]

---

**17.** *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) established the rule that a complaint should not be dismissed for failure to state a claim unless the plaintiff could prove no set of facts in support of his claim which would entitle him to relief. *Id.* at 45–46, 78 S.Ct. at 101–02. This standard has long been a staple of federal practice and is supported by literally hundreds of cases. *See Barber v. Motor Vessel "BLUE CAT,"* 372 F.2d 626 (5th Cir.1967).

**18.** 28 U.S.C. § 2072 (1982); *United States v. Sherwood*, 312 U.S. 584, 589–90, 61 S.Ct. 767, 771, 85 L.Ed. 1058, 1063 (1941).

**19.** As was pointed out in *Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir.1984), every other circuit requires at least a minimum of specificity in the pleading of civil rights complaints. *Id.* at 30, n. 87 (listing cases).

**20.** *See, e.g. Arsenaux v. Roberts*, 726 F.2d 1022 (5th Cir.1982) (more than conclusory allegations necessary to state a claim under § 1983); *Hanson v. Town of Flower Mound*, 679 F.2d 497 (5th Cir.1982) (pleader must allege facts, not legal conclusions to state a claim under § 1983); *Johnson v. Wells*, 566 F.2d 1016 (5th Cir.1978) (in § 1983 action applicant must allege facts that would, if proved, warrant the relief he seeks); *Parish v. N.C.A.A.*, 506 F.2d 1028 (5th Cir.1975) (conclusory allegations no substitute for factual showing of actual discriminatory intent); *Cook v. Whiteside*, 505 F.2d 32 (5th Cir. 1974) (complaint insufficient to state a claim under § 1983 where it failed to allege facts). *See also Slotnick v. Staviskey*, 560 F.2d 31 (1st Cir.1977), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978) (complaints cannot survive motion to dismiss if they contain conclusory allegations but do not support their claims with references to material facts), cited with approval in *Sparks v. Duval County Ranch Co.*, 604 F.2d 976, 978 (5th Cir.1979) (en banc), *cert. denied*, 445 U.S. 943, 100 S.Ct. 1339, 63

Likewise, in habeas cases, 28 U.S.C. § 2254 (*see* Rule 2, Habeas Rules), this court has consistently held that conclusory allegations unsupported by allegations of specific facts are insufficient to support constitutional claims.[21] This is so even in *pro se* petitions.[22]

Probably of greatest importance is that the burden of being able to ascertain what the real facts are in order to determine the defense of immunity is placed squarely on the district judge. The trial judge may not wait on motions or other actions by the parties or counsel. Fortunately, trial judges have the tools to carry out this mission.

Foremost is the recent amendments to F.R.Civ.P. 11.[23] Under the amended rule, as the notes of the Advisory Committee on Rules reflect, the "new language is intended to reduce the reluctance of courts to impose sanctions, see Moore, Federal Practice ¶ 7.05, at 1547, by emphasizing the responsibilities of the attorney and reenforcing those obligations by the imposition of sanctions." *Id.* Equally important, the words of former Rule 11, "good grounds to support" which "were interpreted to

---

L.Ed.2d 777 and 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 483, *aff'd on other grounds sub nom; Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

For similar holdings in other circuits, *see, e.g., Hurney v. Carver,* 602 F.2d 993 (1st Cir.1979); *Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck,* 463 F.2d 620 (2d Cir.1972), *cert. denied,* 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973); *Rotolo v. Borough of Charleroi,* 532 F.2d 920 (3d Cir.1976); *Place v. Shepherd,* 446 F.2d 1239 (6th Cir.1971); *Cohen v. Ill. Institute of Technology,* 581 F.2d 658 (7th Cir.1978), *cert. denied,* 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979); *Harley v. Oliver,* 539 F.2d 1143 (8th Cir.1976); *Uston v. Airport Casino, Inc.* 564 F.2d 1216 (9th Cir.1977); *Taylor v. Nichols,* 558 F.2d 561 (10th Cir.1977).

**21.** *See, e.g., Schlang v. Heard,* 691 F.2d 796 (5th Cir.1982), *appeal dismissed, cert. denied,* 461 U.S. 951, 103 S.Ct. 2419, 77 L.Ed.2d 1310 (1983); *Mayberry v. Davis,* 608 F.2d 1070 (5th Cir.1979); *Cunningham v. Estelle,* 536 F.2d 82 (5th Cir.1976); *Bryant v. Elliott,* 472 F.2d 572 (5th Cir.1973); *Grant v. Georgia,* 358 F.2d 742 (5th Cir.1966). We have also required a similar level of pleading in federal habeas cases under 28 U.S.C. § 2255. *See, e.g., United States v. Jones,* 614 F.2d 80 (5th Cir.1980), *cert. denied,* 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 801 (1980); *Ward v. United States,* 486 F.2d 305 (5th Cir.1973), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2398, 40 L.Ed.2d 768 (1974); *Doyal v. United States,* 456 F.2d 1292 (5th Cir.1972), *cert. denied,* 409 U.S. 870, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *Bankston v. United States,* 433 F.2d 1294 (5th Cir.1970); *Hackworth v. United States,* 423 F.2d 1127 (5th Cir.1970).

**22.** *See Knighton v. Maggio,* 740 F.2d 1344, 1349 (5th Cir.1984):

One claiming ineffective assistance of counsel must identify specific acts or omissions; general statements and conclusionary charges will not suffice. The particular professional failure must be pled and proven.

Quoted with approval. *Green v. McGougan,* 744 F.2d 1189, at 1191 (5th Cir.1984).

**23.** Rule 11. Signing of Pleadings, Motions, and Other Papers; Sanctions.

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
Amendment effective August 1, 1983.

have both factual and legal elements" *id.* "have been replaced by a standard of conduct that is more focused." *Id.* In contrast, the "new language stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule.... This standard is more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation." *Id.* Additionally, the amended rule is to instill in federal trial judges a conviction that the Rule should be read and applied as expressed, since the

> [t]ext of the amended rule seeks to dispel apprehensions that efforts to obtain enforcement will be fruitless by insuring that the rule will be applied when properly invoked. The word "sanctions" in the caption, for example, stresses a deterrent orientation in dealing with improper pleadings, motions or other papers.... And the words "shall impose" in the last sentence focus the court's attention on the need to impose sanctions for pleading and motion abuses. *Id.*

Amended Rule 11, a significant part of the new approach of all of the 1983 amendments, and especially Rule 16 are intended to place on the shoulders of a federal trial judge the role of an active manager and director of the whole litigation process. This starts at the very beginning since the "detection and punishment of a violation of the signing requirement is part of the court's responsibility for securing the system's effective operation." F.R.Civ.P. 11, advisory committee note.

Amended Rule 16 [24] was born of the "widespread feeling that amendment is necessary to encourage pretrial management that meets the needs of modern litigation." F.R.Civ.P. 16 advisory committee note. Consequently it was "extensively rewritten and expanded to meet the challenges of modern litigation." *Id.* The

Amended Rule "makes scheduling and case management an express goal of pretrial procedure." *Id.* Both subdivisions (b) and (c) are aimed at early and vigorous case management by the judge. The "intention is to encourage better planning and management of litigation. Increased judicial control during the pretrial process accelerates the processing and termination of cases. Flanders, *Case Management and Court Management in United States District Courts*, Federal Judicial Center (1977)." F.R.Civ.P. 16(c) advisory committee note.

Finally, both amended Rules 11 and 16 carry explicit provisions for sanctions. If the attorney cannot meet these requirements, the trial courts should heed the words of the Advisory Committee regarding Rule 11: "The new language is intended to reduce the reluctance of courts to impose sanctions ... by emphasizing the responsibilities of the attorney and reinforcing these obligations by the imposition of sanctions." F.R.Civ.P. 11, advisory committee notes.

It bears the strongest emphasis that under amended Rule 11 an attorney's signature on a document certifies that, "to the best of his knowledge, information, and belief formed after *reasonable inquiry* it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, ..." F.R.Civ.P. 11, advisory committee note. (emphasis supplied). This means that in a case ostensibly raising the probable question of immunity, counsel for the plaintiff is affirming that, after making reasonable inquiry, he believes in good faith that the defendant official cannot successfully show he has the defense of immunity. This means also that having that good faith belief, he is able to state

---

**24.** Rule 16(a) provides for pretrial conferences for such purposes as:
  (1) expediting the disposition of the action;
  (2) establishing early and continuing control so that the case will not be protracted because of lack of management;

  (3) discouraging wasteful pretrial activities;
  (4) improving the quality of the trial through more thorough preparation, and;
  (5) facilitating the settlement of the case.

with some particularity what those facts are.

The trial judge has several means to determine the specific facts on which plaintiff relies, from which the judge can draw the legal conclusion on the availability of the immunity defense. First, the judge can, and must, demand full compliance with Rule 11.

■ In order to ensure sufficient specificity, district courts have a ready tool in the F.R.Civ.P. 12(e) motion for more definite statement. Once a complaint against a defendant state legislator, judge, or prosecutor (or similar officer) adequately raises the likely issue of immunity—qualified or absolute—the district court should on its own require of the plaintiff a detailed complaint alleging with particularity all material facts on which he contends he will establish his right to recovery, which will include detailed facts supporting the contention that the plea of immunity cannot be sustained. Such a requirement is not without precedent in this court. In *Watson v. Ault*, 525 F.2d 886 (5th Cir.1976), we approved the district court's use of a questionnaire in order to develop the factual bases of *pro se* prisoner complaints in § 1983 actions. We said there:

> complainants may be required to respond to the questionnaire as a necessary pleading auxiliary, in the nature of a motion for a more definite statement, Rule 12(e) F.R.Civ.P., in order that the court may assess the factual and legal bases of the claim asserted.

*Id.* at 892.[25]

■ Because the conspiracy among Perez, the District Attorney, Klein, his as-

sistant, and Judge Leon is at the center of every real claim made against them by the plaintiffs, we reach the conclusion that this Court should not, on the loose allegations of the complaint, undertake the "iffy" task of determining whether each (or both) appellants are entitled to immunity. Any such attempt would be not only arduous, but the result would be suspect. We would be running the risk of declarations of law on something which might never be. Vitally important to the public good as is the doctrine of official immunity, we ought not to imperil its application or undermine its strength by opinions expressed on situations or circumstances which may never have occurred. And yet, that is likely to happen when neither us, nor the trial court, has any but the vaguest of notions about what the real probable facts are.

For the reasons pointed out we think good administration calls for vacating [26] the judgment and remanding the case for action by the trial court consistent with this opinion.[27]

VACATED and REMANDED.

PATRICK E. HIGGINBOTHAM, concurring specially:

In his own inimitable way, Judge Brown has threaded his way to a sound result. It is a threading task because we must accommodate an exquisite confrontation: on the one hand, defendants enjoy an immunity from suit which reaches beyond trial and protects them from the debilitating processes of discovery; on the other hand, the notice pleading concepts rest on acceptance

---

**25.** While the class of pleadings which are appropriate for a motion under Rule 12(e) has been deemed quite restricted under the current Rules, *see* C. Wright and A. Miller, *Federal Practice and Procedure* § 1376 (1969), largely because of liberal availability of broad discovery, we are not here considering the use of Rule 12(e) as a weapon available to the parties, but rather as a tool available to the court to comply with the mandate in situations of immunity.

**26.** This includes the judgment on the § 1985 claim. *See Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983).

**27.** Although the district court below concluded that Klein acted within the scope of his absolute prosecutorial immunity, that conclusion was based in part on the sworn pleadings from another case. On remand, the district court should, if it chooses to rely on these pleadings, see to it that these materials are in acceptable form for use on summary judgment and then make specific findings of fact to the extent these outside pleadings provide the basis for its decision.

of the idea that one may sue now and discover later what his claim is. My notions of Article III versus Article I power require me to follow a more modest path, but I reach the same conclusion.

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Congress, of course, sanctioned Rule 9(b) in the Enabling Act, 28 U.S.C. § 2072, but I do not know where we find the authority to add the requirement that claims against officials who enjoy immunity from suit shall be pled with particularity. Nor do I see that it is necessary to the result to do so. Rather, I would conclude that no claim is stated against officials who hold positions which enjoy absolute immunity absent a statement of sufficient facts which, if true, would demonstrate the absence of immunity. If the filing of a complaint grants immediate access to our elaborate discovery machine and our substantive law teaches that such access is not available in immunity cases, it follows for me that absent the detailing of facts sufficient to negative immunity, no federal claim is stated. In other words, our task is, in the first instance, one of deciding what the claim is; what is short and plain has no universal meaning independent of the nature of a claim. It does no violence to notice pleading to suggest that the adequacy of a pleading is case specific.

This is not dissimilar from the effort to accommodate notice pleading in antitrust cases where a plaintiff seeks relief for conduct which is *prima facie* protected by the First Amendment under the *Noerr-Pennington* doctrine. *See generally* P. Areeda, *Antitrust Law* ¶ 203.4b (1982 Supp.). In this circumstance, courts have said that "the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be re-

quired." *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076, 1083 (9th Cir.1976). While this effort in the antitrust cases to heighten pleading requirements while remaining faithful to Fed.R.Civ.P. 8 has been the subject of continuing debate, *compare, e.g., Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1177 n. 8 (10th Cir.1982), *with Sage International, Ltd. v. Cadillac Gauge*, 507 F.Supp. 939 (E.D.Mich.1981), it supports our attempt to preserve the essence of the immunity defense by requiring specific allegations here.

That such an approach is not a judicial amendment to Rule 9(b) but is rather a definition of the claim is more convincing in the immunity context. If immunity protects a defendant from the discovery process, as it does,[1] and the statement of a claim grants access to that process, as it does under notice pleading, then a well-pleaded claim must overcome the immunity. Of course, some plaintiffs will be unable to state a claim without the benefit of discovery, even though discovery might have surfaced sufficient facts, but denial of some meritorious claims is the direct product of the immunity doctrine which weighed these losses when it struck the policy balance. This, at least for me, only makes the plainer that I am on sure ground in concluding that the accommodation of notice pleading and immunity presents a question of claim definition, peculiarly within the authority granted to us by Article III.

This is far more than a semantical shell game. We must solve judicial problems, and we must not solve legislative problems. My effort has been to demonstrate that it is a judicial problem—defining the content of immunity—that we face here. By this path, I reach the same conclusion as the majority and therefore join its result.

---

1. While the Court has not yet explicitly assured officials enjoying absolute immunity freedom from all discovery processes, as the majority opinion points out, the Court has made efforts to vindicate the values of immunity by circumscribing where possible the right to subject officials to trial or traditional discovery concerning acts for which they are likely immune.