894 F.2d 174
 58 Ed. Law Rep. 457
 Frank NIETO, Plaintiff-Appellee,
v.
SAN PERLITA INDEPENDENT SCHOOL DISTRICT, Jimmy Crow, Raul
Chapa, Brenda Fort, Vickie Shewmaker, Jeannine Tankersley,
Billy Bob Todd and Carl Medley, In Their Official and
Individual Capacities, Defendants-Appellants.
 No. 89-2417.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 16, 1990.
 
 Travis Hiester, Atlas, Hall, McAllen, Tex., for defendants-appellants.
 Horacio L. Barrera, Martinez & Barrera, Brownsville, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before DAVIS and SMITH, Circuit Judges, and LITTLE,[1] District Judge.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 Frank Nieto filed a Sec. 1983 action against a number of defendants, including appellants, who are members of the San Perlita Independent School District Board of Trustees, the school district superintendent, the high school principal, and the basketball coach. Appellants moved for summary judgment on the basis of qualified immunity and the district court denied their motion. We reverse.
 
 I.
 
 2
 Plaintiff Frank Nieto was employed as a maintenance supervisor by the San Perlita Independent School District, a small south Texas school district with approximately 260 students and 30 employees. Mr. Nieto primarily performed janitorial or custodial duties at the schools and supervised other custodians. In late 1986 Mr. Nieto apparently became concerned with what he considered inappropriate conduct of the high school basketball coach Carl Medley. Mr. Nieto began pulling students out of class at San Perlita High School to question them about Medley, as well as questioning students at lunch and on the school campus.
 
 
 3
 Nieto complained to the high school principal, Raul Chapa, that Medley had used profanity in front of students, and had physically abused students. According to Chapa's affidavit, his investigation showed that Medley had occasionally used inappropriate language, but that the complaints of physical abuse were denied by all the students reportedly involved.
 
 
 4
 Teachers at San Perlita High School complained about the disruptive effect of Mr. Nieto's actions in pulling students out of class. Several teachers also complained that Mr. Nieto listened to their class discussions and their private conversations in the teachers' lounge to gather information about coach Medley and about other teachers. Other school employees stated that Mr. Nieto spent so much time and energy on his investigation of coach Medley he was unable to properly perform his work, and that he discouraged other custodians from performing their work or misinformed them as to what was requested of them.
 
 
 5
 Mr. Chapa stated he had conferences with Mr. Nieto on several occasions concerning the teachers' complaints, and repeatedly directed Mr. Nieto to stop his investigative activities.
 
 
 6
 In March 1987, Mr. Nieto appeared before the school board at a public meeting and voiced complaints about Medley, Chapa and Crow. Medley was subsequently issued a letter of reprimand but when his employment contract expired the school board renewed it.
 
 
 7
 Following his appearance at the school board meeting Mr. Nieto continued to remove students from class and listen in on teacher conversations. The majority of the teachers at San Perlita High School told principal Chapa and superintendent Crow that they would not return the following year if Mr. Nieto was retained as an employee of the school district.
 
 
 8
 In early April 1987, almost all of the teachers at San Perlita High School signed a letter to the school board in support of Mr. Chapa and Mr. Crow and asked the board to promptly "resolve the present problems" concerning Mr. Nieto.
 
 
 9
 Members of the board stated by affidavit that at its April meeting the board in executive session discussed Nieto's activities but determined it was the superintendent's responsibility to handle the situation. Nieto contends that the board in executive session instructed the superintendent to fire him.
 
 
 10
 The day following the April board meeting, Crow and Chapa met with Mr. Nieto and the superintendent informed Mr. Nieto that he was terminated.
 
 
 11
 Mr. Nieto filed suit in November 1987 against San Perlita Independent School District, and against superintendent Jimmy Crow, principal Raul Chapa, school board members Brenda Fort, Vickie Shewmaker, Jeannine Tankersley, and Billy Bob Todd, and Coach Carl Medley in their individual and official capacities. Mr. Nieto alleged in his Sec. 1983 action that his termination as maintenance supervisor violated his First Amendment rights as well as his right to procedural Due Process guaranteed him by the Fourteenth Amendment. More specifically, Mr. Nieto alleged that he was dismissed as "retaliation for having made complaints about the Coach, Superintendent and Principal" and "for reporting violations of school board policy and state law concerning the conduct of a coach and the failure of the Superintendent and Principal to take any action against him." The complaint also alleged:
 
 
 12
 10. On several occasions [Mr. Nieto] heard coach Medley use profanity in front of the students in violation of school board policy. He also saw him physically abuse students....
 
 
 13
 11. On or about the 10th day of March, 1987, the plaintiff appeared before the San Perlita Independent School District Board of Trustees to present the complaints about Coach Medley and Ron Squires. On that date the school district heard the complaints.
 
 
 14
 The individual defendants answered the suit and asserted the defense of qualified immunity. They also moved for a more definite statement and an order staying discovery.
 
 
 15
 The district court granted both of the defendants' motions and entered an order staying discovery and requiring the plaintiff to plead with more particularity. Although Nieto amended his complaint, he included no significant additional details of his claim. After Nieto amended his complaint, appellants moved for summary judgment seeking a dismissal of the suit. In response to defendants' detailed summary judgment evidence, Nieto offered only that Principal Chapa told him "the reason for his dismissal had to do with the letter of complaint he had distributed to the Board Members," and "that he had attacked allot [sic] of teachers."
 
 
 16
 The district court partially granted defendants' motion for summary judgment and struck plaintiff's procedural due process claim. The district court denied defendants' summary judgment motion on the ground of qualified immunity, and also denied defendants' summary judgment motion leveled at plaintiff's First Amendment claim. The individual defendants appeal the district court's denial of qualified immunity.
 
 II.
 A.
 
 17
 The parties agree that this court has jurisdiction to review the district court's denial of summary judgment predicated on qualified immunity. See Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).
 
 
 18
 In reviewing the district court's ruling on a motion for summary judgment, we apply the same standard that governs the district court. Bache v. American Tel. & Tel., 840 F.2d 283 (5th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 219, 102 L.Ed.2d 219 (1988). To defeat a motion for summary judgment, the plaintiff "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 
 19
 The Supreme Court has consistently held that "Government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). See also Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir.1988) (Geter I). Public officials who are required to exercise their discretion enjoy a qualified immunity defense to Sec. 1983 actions, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738; Whatley v. Philo, 817 F.2d 19 (5th Cir.1987). The reason for granting the qualified immunity to public officials is clear: "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985), quoting Harlow, 457 U.S. at 819, 102 S.Ct. at 2739.
 
 
 20
 In granting qualified immunity to officials, the Supreme Court is concerned not only with protecting officials from money judgments, but also with "the general costs of subjecting officials to the risks of trial--distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815, quoting Harlow, 457 U.S. at 816, 102 S.Ct. at 2737.
 
 The Court in Harlow thereby
 
 21
 refashioned the qualified immunity doctrine in such a way as to "permit the resolution of many insubstantial claims on summary judgment" and to avoid "subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery" in cases where the legal norms the officials are alleged to have violated were not clearly established at the time.
 
 
 22
 Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815, quoting Harlow, 457 U.S. at 817-18, 102 S.Ct. at 2737-38.
 
 
 23
 This circuit has similarly recognized "the substantial costs which result from merely subjecting public officials to the defense of damage claims." Elliott v. Perez, 751 F.2d 1472, 1477 (5th Cir.1985) (emphasis in original). Consequently we view the defense of qualified immunity as "an immunity from suit," which "extends beyond just a defense to liability to include all aspects of civil litigation." Jacquez v. Procunier, 801 F.2d 789, 791 (5th Cir.1986) (emphasis in original).
 
 
 24
 Consistent with the notion that this qualified immunity to public officials is an immunity from suit, the Supreme Court and this Circuit "have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." Geter I, 849 F.2d at 1553 quoting Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3042-43 n. 6, 97 L.Ed.2d 523. Thus, until resolution of the threshold question of the application of an immunity defense, "discovery should not be allowed." Elliott v. Perez, 751 F.2d 1472, 1478 (5th Cir.1985), quoting Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738 (1982). As we observed in Geter I, "plaintiffs must demonstrate prior to discovery that their allegations are sufficiently fact-specific to remove the cloak of protection afforded by an immunity defense." Id. at 1553. See also Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).
 
 
 25
 To accomplish this goal, we have imposed a heightened pleading obligation, requiring the plaintiff in the complaint to state specific facts sufficient to overcome the qualified immunity defense. See Elliott, 1479 & n. 20, and cases cited therein. "[A]llowing broadly-worded complaints.... which leave[ ] to traditional pretrial depositions, interrogatories, and requests for admission the development of the real facts underlying the claim, effectively eviscerates important functions and protections of official immunity." Elliott at 1476.
 
 
 26
 Consequently the plaintiff in a Sec. 1983 suit "must shoulder the burden of pleading a prima facie case, including the obligation of alleging 'detailed facts supporting the contention that the plea of immunity cannot be sustained.' " Lynch v. Cannatella, 810 F.2d 1363, 1376 (5th Cir.1987), quoting Morrison v. City of Baton Rouge, 761 F.2d 242, 245 (5th Cir.1985). The Supreme Court in Mitchell v. Forsyth explained the plaintiff's burden further: "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." 472 U.S. at 526, 105 S.Ct. at 2815, quoted in Jacquez at 791. This Circuit has held that "Once a complaint against [an official] ... adequately raises the likely issue of immunity ... the district court should on its own require of the plaintiff a detailed complaint alleging with particularity all material facts on which he contends he will establish his right to recovery, which will include detailed facts supporting the contention that the plea of immunity cannot be sustained." Elliott, 751 F.2d at 1482.
 
 
 27
 We now apply these legal principles to Mr. Nieto's action.
 
 B.
 
 28
 Mr. Nieto asserts that he was dismissed by the school district because he engaged in constitutionally protected speech. To overcome appellants' qualified immunity defense raised in their motion for summary judgment, Nieto was required to allege particular facts that if proven would establish that the conduct of the individual defendants violated the plaintiff's clearly established right to protected speech. See Elliott at 1482; Brown v. Texas A & M University, 804 F.2d 327, 333 (5th Cir.1986).
 
 
 29
 To determine whether a public employer has wrongfully discharged an employee for engaging in protected speech requires a balancing of the interest of the employee as a citizen in commenting on matters of public concern with the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); see Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). But in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court expanded on the Pickering test and held that before the balancing test prescribed by Pickering need be applied the court must first determine that the employee's speech is a matter of public concern: "Pickering, its antecedents, and its progeny lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge." Connick, 461 U.S. at 146, 103 S.Ct. at 1690.
 
 
 30
 The Supreme Court in Connick rejected the notion that broad classifications of speech such as criticism directed to public officials is necessarily a matter of public concern. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark--and certainly every criticism directed at a public official--would plant the seed of a constitutional case." Connick at 149, 103 S.Ct. at 1691. The Court instead instructed that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. The fact-specific nature of this inquiry has been closely followed by the courts since Connick. See, e.g., Rankin; Johnston v. Harris County Flood Control Dist., 869 F.2d 1565 (5th Cir.1989); Brown v. Texas A & M University, 804 F.2d 327 (5th Cir.1986).
 
 
 31
 We question whether Nieto has pled with sufficient particularity the form, content and context of the speech he relies upon to permit us to determine whether it is a matter of public concern. Because even vague complaints that teachers are abusing students can quickly become matters of public concern, we assume without deciding that Nieto's complaint to the school board addressed a matter of public concern.
 
 
 32
 We now turn to the balancing test established by Pickering and Connick.
 
 
 33
 Once an employee's statements are found to address a matter of public concern, the court must balance "the interests of the [employee], as a citizen" in making those statements against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs," for the purpose of determining whether the employee enjoyed a constitutionally protected right to free speech. Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. This balancing is to be conducted by the court as a matter of law; "[t]he inquiry into the protected status of speech is one of law, not fact," and the court "cannot 'avoid making an independent constitutional judgment on the facts of the case.' " Connick, 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1692 n. 10.
 
 
 34
 It is not clear from its order that the district court conducted the prescribed balancing of interests in this case.[2] In any event, we review the district court's determinations of law de novo. Kirkland v. Northside Indep. School District, 890 F.2d 794, 797-98 (5th Cir.1989). See also Page v. DeLaune, 837 F.2d 233, 237 (5th Cir.1988), Terrell v. University of Texas System Police, 792 F.2d 1360, 1362 n. 2 (5th Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). The Supreme Court in Connick stated that "we are compelled to examine for ourselves the statements in issue and the circumstances under which they [are] made to see whether or not they ... are of a character which the principles of the First Amendment ... protect." Connick, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10, quoting Pennekamp v. Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946). The burden rests with the plaintiff to show that his speech was constitutionally protected. Mt. Healthy City School Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977); Pickering, 391 U.S. at 569-72, 88 S.Ct. at 1735-36.
 
 
 35
 The Supreme Court in Connick reaffirmed its holding in Pickering that "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." Connick, 461 U.S. at 150, 103 S.Ct. at 1692. This Circuit has also recognized that the balancing test "is not all-or-nothing but rather a sliding scale under which 'public concern' is weighed against disruption: '[A] stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern.' " Matherne v. Wilson, 851 F.2d 752, 761 (5th Cir.1988) quoting Gonzalez v. Benavides, 774 F.2d 1295 (5th Cir.1985), cert. denied, 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986) (Gonzalez II). See also Frazier v. King, 873 F.2d 820, 826 (5th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989).
 
 
 36
 In Brawner v. City of Richardson, Tex., 855 F.2d 187 (5th Cir.1988), we stated that in conducting this balancing the court may consider whether the speech (1) was likely to generate controversy and disruption, (2) impeded the public agency's general performance and operations, and (3) affected working relationships necessary to the agency's proper functioning. See Brawner, 855 F.2d at 192. We further observed in Matherne that we must "tailor the analysis to the particular facts of each case," and depending upon the case a court may consider other factors affecting the effective fulfillment of the state's mission. See Matherne at 760 n. 48, citing McBee v. Jim Hogg County, Tex., 730 F.2d 1009, 1016 (5th Cir.1984) and Rankin, 483 U.S. at 388, 107 S.Ct. at 2899.
 
 
 37
 Nieto provides no particulars of his criticism of the school principal, superintendent or teachers except coach Medley, and Nieto has given us only minimal details of the content of his complaints about coach Medley. All we know is that he complained of Medley's alleged profanity in the presence of students and physical abuse of the students. Because of the complete absence of facts in the record concerning Nieto's speech about teachers and school officials other than Medley, we limit our application of the Pickering balancing to Nieto's complaints about coach Medley.
 
 
 38
 The defendants attached a number of detailed affidavits to their summary judgment motion that describe significant disruption of the work relationships, teaching, and custodial efforts at San Perlita High School as a result of Mr. Nieto's speech. The majority of San Perlita High School teachers informed Principal Chapa that they would seek employment elsewhere the following year if Mr. Nieto remained with the school district; Mr. Nieto was at odds with almost all of the employees of the school district during this period and was unable to work harmoniously with almost anyone; a group of teachers presented a letter to the school district board of trustees requesting that something be done about the disruptiveness and devisiveness caused by Mr. Nieto; Mr. Nieto refused to perform tasks requested of him, discouraged other custodians from performing the work requested of them, and misrepresented to the custodians what was demanded of them; and at least one teacher altered his classroom discussion for fear that Mr. Nieto would overhear it, use it out of context and make his teaching discussion appear improper.
 
 
 39
 Nieto filed no affidavits or other summary judgment evidence. He has instead elected to rest on his broadly worded petition that coach Medley used profanity with and physically abused students. The highly inflammatory accusation of physical abuse of students is refuted, however, by defendants' summary judgment evidence.
 
 
 40
 First, coach Medley denies the accusation. Also, the principal, Mr. Chapa, stated that he found after investigating Mr. Nieto's complaints that Medley on occasion had used inappropriate language, but that any physical contact was denied by all the students allegedly involved. Chapa further attested that Mr. Nieto made allegations about other teachers and personnel which were always found to be groundless. A maintenance worker with the school district stated that since Mr. Nieto's nephew was kicked off the basketball team, he wanted to get back at all people involved. She also stated that Mr. Nieto told her coach Medley threw a ball at her son and hit him in anger; when she asked her son about it, he denied it.
 
 C.
 
 41
 We conclude that the interest of the school board in running its school system outweighs Nieto's right to speak as he did about coach Medley. Assuming without deciding that the speech was on a matter of public concern, the public importance of Nieto's speech is substantially reduced in our balancing equation for two reasons: First, and in the face of an order by the district court to amend his petition, Mr. Nieto has elected to stand or fall on conclusory pleadings and without furnishing summary judgment evidence that explains what he said and what factual foundation supports his statements. Second, the summary judgment evidence submitted by the defendants refutes Nieto's accusation of physical abuse and leads us to conclude that Nieto's accusation is unfounded.
 
 
 42
 Against this speech that at most is entitled to very limited protection, defendants produced unrefuted evidence that Nieto's speech caused severe disruption in the operation of the school system. Thus, in this public employment context Nieto's accusations are beyond the protection of the First Amendment. Consequently, the defendants did not violate a clearly established constitutional right secured to Nieto. They are therefore entitled to qualified immunity and dismissal from this suit. We reverse the district court's denial of summary judgment based on qualified immunity and remand this case to the district court with instructions to enter judgment in favor of the individual defendants, and for further proceedings consistent with this opinion.
 
 
 43
 REVERSED and REMANDED.
 
 
 
 [1]
 District Judge of the Western District of Louisiana, sitting by designation
 
 
 [2]
 Concerning the qualified immunity defense, the court stated only that "plaintiff's factual allegations that defendants dismissed him for attempting to bring attention to Coach Medley's conduct would support a conclusion that defendants' conduct violated constitutional law that was clearly established at the time of their conduct." When considering plaintiff's first amendment claim directly, the court concluded: "given the allegations at this stage of the case, a reasonable trier of fact could find if he or she so desired, that plaintiff had been dismissed because of his first amendment activities and, therefore, defendants' motion for summary judgment is denied as to plaintiff's First Amendment claim."